**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**
File Name: 10a0551n.06

**No. 08-1121**

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

|  |  |  |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| **Plaintiff–Appellee,** | ) | **FILED**<br>**Aug 26, 2010**<br>LEONARD GREEN, Clerk |
| | ) | |
| **v.** | ) | **ON APPEAL FROM THE UNITED** |
| | ) | **STATES DISTRICT COURT FOR THE** |
| **JASON BEARD,** | ) | **WESTERN DISTRICT OF MICHIGAN** |
| | ) | |
| **Defendant–Appellant.** | ) | |
| | ) | |

Before: KEITH, COLE, and GIBBONS, Circuit Judges.

**JULIA SMITH GIBBONS, Circuit Judge.** Defendant–appellant Jason Beard was convicted of conspiracy to possess with intent to distribute controlled substances and sentenced to 240 months imprisonment. On appeal, he argues that: (1) the district court should not have admitted evidence seized from the conspiracy after Beard had already been terminated from it; (2) evidence of unindicted bad acts should have been excluded under Federal Rule of Evidence 404(b); and (3) his offense level should not have been enhanced under U.S.S.G. § 3B1.1(b) for playing a supervisory or managerial role in the conspiracy. For the reasons set forth below, we affirm Beard's conviction and sentence.

I.

In the fall of 2005, Rex Furlough began expanding his drug-dealing business from Green Bay, Wisconsin, to the Upper Peninsula of Michigan. He was introduced to Debbie and James

Green, who owned a house in Menominee, Michigan, and became Furlough's connection to potential customers in the area. Furlough made regular trips—once or twice per week—from Green Bay to Menominee to sell crack. At first, he brought relatively small amounts—only half an ounce per trip—but as his business improved, he gradually began to bring larger quantities, up to as much as nine ounces per trip starting in May of 2006. Furlough employed the Greens to sell the crack cocaine as well. Typically, Furlough remained in the living room of the Greens' house when a customer came to the door. The Greens would answer the door and relay the money to Furlough, who then gave the Greens drugs to give to the customers. Because the Greens were addicted to cocaine at the time, Furlough did not trust them to deal drugs unsupervised. Indeed, Furlough paid the Greens exclusively with drugs.

As business improved, Furlough decided to recruit more people to aid his drug operations. Thus, in May 2006, he enlisted his second cousin, defendant–appellant Jason Beard, to take over the role of supervising the Greens. Beard was responsible for handling the drugs, accounting for the money, and paying the Greens with drugs. In exchange, Furlough paid Beard $1,000 per week. Furlough estimated that he and Beard made between five and ten drug runs to Menominee while Beard was supervising operations there, during which time they transported and sold between one and a half and two kilograms of cocaine. Furlough also hired Vicki Walton to deal drugs for him, although she was more reliable and trustworthy than the Greens and did not require supervision by Beard. In the middle of August 2006, Furlough discovered that Beard had stolen approximately $1,000 from him and fired Beard. Furlough replaced Beard with Robert Turnbo, to whom he gave the same pay and responsibilities.

On the night of September 20, 2006, officers with the Upper Peninsula Substance Enforcement Team and the federal Bureau of Alcohol, Tobacco, Firearms, and Explosives executed a search warrant for the Greens' house. When the officers entered, they discovered Furlough and Turnbo sitting in the living room and arrested them immediately. The officers also found large amounts of powder and crack cocaine and cash, small amounts of cocaine individually packaged for sale, a digital scale, packaging materials, and a razor blade. The search quickly led to the arrest of several members of the conspiracy, although not of Beard.

When Walton heard about Furlough's arrest, she flushed down the toilet the remainder of the cocaine she had been selling for Furlough. As a result of not being able to sell those drugs, she still owed Furlough several thousand dollars. Sometime in mid-October 2006, Beard visited Walton to try to collect on the debt. Although Walton was unable to pay back the debt at that time, Beard proposed an arrangement under which Walton could work off the debt by selling drugs that Beard began to supply her. Walton employed Shawn Klatt to help her sell the drugs, but at some point Klatt informed Walton that the drugs she had given him were stolen and he was thus unable to pay the $1,000 he owed her. When Walton told Beard about the shortfall on November 3, 2006, Beard, his brother, and Walton all went to Klatt's house to attempt to collect on the debt. After leaving the house, they were stopped by officers from the Menominee Sheriff's Department and arrested. Beard was questioned but denied any involvement in Furlough's drug conspiracy, claiming instead that he traveled to Menominee because he liked to go fishing and meet women. A search of Walton's house following the arrest uncovered a quantity of cocaine that she testified was given to her by Beard.

Beard was indicted on February 27, 2007, on one count of conspiracy to distribute and to possess with intent to distribute controlled substances. At trial, the government proved the facts

recounted above. When the prosecution attempted to introduce evidence obtained during the search of the Greens' house, defense counsel objected on the grounds that Beard was not involved in the conspiracy at the time of the search. The government responded that there was still an ongoing conspiracy at the time, testimony about what was found during the search is illustrative of the scope of the conspiracy, and Turnbo's role demonstrated the extent of Beard's involvement in the conspiracy. The court overruled the objection and admitted the evidence.

Beard also objected to the introduction of the unindicted drug-related activities he engaged in with Walton starting in mid-October 2006. The prosecution argued that the evidence was admissible under Rule 404(b) because it tended to show Beard's intent to be a drug dealer, his familiarity with other participants in the conspiracy, and his absence of mistake in being in Menominee. At one point during the lengthy sidebar discussing the issue, counsel for Beard stated, "I know the involvement with [Walton] can be used for intent." The parties and the court agreed that any mention of guns would be excluded, and when the district court asked Beard's counsel whether he "still ha[d] a 404(b) objection," counsel responded, "No, Your Honor. Keep the guns out and the drug issue out." The disputed testimony was given, and, at its conclusion, the district court gave a limiting instruction, which it later repeated at the end of trial. The jury subsequently returned a verdict of guilty.

At sentencing, Beard objected to the Presentence Investigation Report's ("PSR") recommendation that the court apply a three-level enhancement under United States Sentencing Guidelines ("U.S.S.G.") § 3B1.1(b) for a managerial or supervisory role in the conspiracy. Beard argued that certain testimony at trial indicated that Beard "didn't seem that significant at all in this big scheme of things." The court disagreed, finding that Beard's role in the offense was to supervise

the Greens and manage the drug sales in the Menominee area, activities that clearly fit the definition of § 3B1.1(b). Beard's base offense level was calculated to be 34, increased to 37 after the supervisory enhancement. Given a criminal history category of III, Beard's Guidelines range was 262 to 327 months. Following its analysis of the applicable 28 U.S.C. § 3553(a) factors, the district court imposed a below-Guidelines sentence of 240 months imprisonment. Beard timely appealed.

II.

We review a district court's evidentiary rulings for abuse of discretion. *United States v. Gibson*, 409 F.3d 325, 337 (6th Cir. 2005). "A district court abuses its discretion when it relies on clearly erroneous findings of fact, uses an incorrect legal standard, or applies the law incorrectly." *Kerobo v. Sw. Clean Fuels, Corp.*, 285 F.3d 531, 533 (6th Cir. 2002) (citations and internal quotation marks omitted). "Where an error is not of constitutional dimension, it is harmless unless it is more probable than not that the error materially affected the verdict." *United States v. Martin*, 897 F.2d 1368, 1372 (6th Cir. 1990) (citing *United States v. Neuroth*, 809 F.2d 339, 342 (6th Cir. 1987) (*en banc*)).

A.

Beard first argues that because he left the conspiracy weeks before the September 20 search, any evidence seized during that search was inadmissible against him. Although Beard does not indicate on appeal the evidentiary rule on which he relies in raising this objection, at trial he made a relevancy objection under Federal Rule of Evidence 403. Beard acknowledges the general rule that the government has the "right to prove the entire scope of the conspiracy," *see United States v. Kelley*, 849 F.2d 999, 1004 (6th Cir. 1988), but claims that evidence of the scope of the entire conspiracy is generally limited to "acts that occurred during the period of time that the defendants

5

on trial were participating in the conspiracy's activities." Appellant Br. at 12 (citing *United States v. Bartholomew*, 310 F.3d 912, 921 (6th Cir. 2002)).

Beard's argument for a limitation on proof of the scope of a conspiracy derives no support from *Bartholomew*. *Bartholomew* in fact strongly endorses the proposition that evidence of a conspiracy prior to a conspirator's joining it is admissible. 310 F.3d at 921. *See United States v. U.S. Gypsum Co.*, 333 U.S. 364, 393 (1948). Here, the evidence found during the search is directly probative of the scope of the conspiracy; the fact that Beard was not involved in the sale of the particular drugs found during the search results in no significant prejudice. The district court did not abuse its discretion in admitting the evidence seized during the search.

B.

Beard also argues that evidence of his involvement with Walton that occurred after the indicted conspiracy had ended should not have been admitted. He argues that intent was not a valid ground for admission of this evidence under Rule 404(b) because the evidence at issue did not go to his intent to be part of the conspiracy itself. Federal Rule of Evidence 404(b) provides: "Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith." However, such evidence may be admissible for "other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." Fed. R. Evid. 404(b). In general, "[i]n determining the admissibility of bad acts evidence under Rule 404(b), a trial judge is accorded broad discretion." *United States v. Vance*, 871 F.2d 572, 576 (6th Cir. 1989) (citation and internal quotation marks omitted).

The government argues that Beard waived this issue by withdrawing his objection to the admission of the evidence during trial. This argument has merit. Although Beard initially objected

6

to the introduction of the November 2006 evidence of his attempts to collect a debt for the conspiracy, by the end of the sidebar discussion of the relevant Rule 404(b) issues, counsel for Beard appeared to withdraw his objection. After the prosecutor agreed that he would avoid any reference to the guns Beard used at the time, the court asked defense counsel: "Given those parameters, then, . . . do you still have a 404(b) objection?" Counsel responded, "No, Your Honor. Keep the guns out and the drug issue out."[1] Later, at the close of Walton's testimony, the court noted that "as I understand it, there is no 404(b) objection." At no other point did defense counsel object to the admission of the relevant testimony. Counsel's actions here constitute waiver. "Whereas forfeiture is the failure to make the timely assertion of a right, waiver is the 'intentional relinquishment or abandonment of a known right.'" *United States v. Olano*, 507 U.S. 725, 733 (1993) (quoting *Johnson v. Zerbst*, 304 U.S. 458, 464 (1938)). We have held that the withdrawal of an objection at trial is the "sort of abandonment of an issue raised by way of motion [that] waives any right of appeal on that issue." *United States v. Denkins*, 367 F.3d 537, 544 (6th Cir. 2004) (citing *United States v. Sheppard*, 149 F.3d 458, 461 (6th Cir. 1998)). We therefore affirm the district court on the ground that Beard has waived his objection.

### III.

The question of what standard of review to apply to the imposition of a leadership enhancement under U.S.S.G. § 3B1.1 is unsettled in this circuit. *See United States v. Young*, 553 F.3d 1035, 1052–53 (6th Cir. 2009) (collecting cases). Some cases have reviewed the district court's factual findings for clear error and its legal conclusions *de novo*, *see, e.g.*, *United States v. Walls*, 546 F.3d 728, 734 (6th Cir. 2008), whereas others have given clear-error deference to the entire

---

[1]This appears to have been a misstatement. The drug issue was not excluded.

determination, *see, e.g.*, *United States v. Jeross*, 521 F.3d 562, 579 (6th Cir. 2008) (citing *United States v. Ward*, 506 F.3d 468, 476 (6th Cir. 2007)). Beard concedes that "the weight of authority suggests" that clear error is the appropriate standard. Because the result in this case is the same under either standard, we need not resolve the proper standard of review.

Under U.S.S.G. § 3B1.1(b), a three offense-level enhancement can be given based on the defendant's role in the offense "[i]f the defendant was a manager or supervisor (but not an organizer or leader)."[2] In determining whether this enhancement applies, courts consider such factors as "the defendant's exercise of decision-making authority, any recruitment of accomplices, the claimed right to a larger share of the fruits of the crime, the degree of participation in planning the offense, and the degree of control the defendant exercised over others." *United States v. Solorio*, 337 F.3d 580, 600–01 (6th Cir. 2003) (quoting *United States v. Dupree*, 323 F.3d 480, 491 (6th Cir. 2003)) (internal quotation marks omitted). The burden of proving when the enhancement is appropriate is low: "'[T]here need only be evidence to support a finding that the defendant was a manager or supervisor of at least one other participant in the criminal activity . . . .'" *United States v. Moncivais*, 492 F.3d 652, 661 (6th Cir. 2007) (quoting *United States v. Henley*, 360 F.3d 509, 517 (6th Cir. 2004)).

Beard argues that the three-level enhancement was not appropriate for several reasons. He first asserts that he played no role in planning the offense and had no decision-making authority. He contends that he did not recruit any accomplices, find new customers, or have a right to a larger share of the proceeds of the conspiracy. At oral argument, Beard contended that his role involved

---

[2]The Guidelines also require that the conspiracy have consisted of five or more participants, but Beard concedes this element of the enhancement is met.

supervision of the drugs only, not of any people. Finally, Beard claims that although he "arguably had some nominal control over the Greens, they routinely refused to take directions from [him]," and that Debbie Green described his role "in modest terms" at trial.

Although Beard did not have nearly the same level of leadership as Furlough, it is clear from the record at trial that Beard was employed by Furlough for the express purpose of supervising the Greens. Beard's role in the conspiracy was to handle the drugs and money, authorize any transactions, and ensure that the Greens did not steal or sell to customers who were short on cash. James Green even testified that Beard was there to "be the boss." When Beard was fired from the conspiracy, Furlough hired Turnbo to replace him and to serve the same supervisory role. Beard clearly exercised a high "degree of control . . . over others." *See Solorio*, 337 F.3d at 601. The district court was therefore not clearly erroneous in applying the enhancement. Even under the stricter standard reviewing the district court's legal decisions *de novo*, the imposition of the § 3B1.1(b) enhancement was appropriate.

IV.

For the reasons discussed above, we affirm Beard's conviction and sentence.