RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 14a0057p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

v.

DOUGLAS L. WRIGHT (12-4445), BRANDON L. BAXTER (12-4447), CONNOR C. STEVENS (12-44480, and ANTHONY M. HAYNE (12-4493),

*Defendants-Appellants.*

Nos. 12-4445/4447/4448/4493

Appeal from the United States District Court
for the Northern District of Ohio at Cleveland
No. 1:12-cr-00238—David D. Dowd, Jr., District Judge.

Argued: December 4, 2013

Decided and Filed: March 28, 2014

BEFORE: COLE and CLAY, Circuit Judges; BERTELSMAN, District Judge.[*]

_____

**COUNSEL**

**ARGUED:** Anthony J. Vegh, Cleveland, Ohio, for Appellant in 12-4445. Kevin M. Schad, FEDERAL PUBLIC DEFENDER'S OFFICE, Cincinnati, Ohio, for Appellant in 12-4447. Paul L. Nelson, FEDERAL PUBLIC DEFENDER'S OFFICE, Grand Rapids, Michigan, for Appellant in 12-4448. Dennis Belli, Columbus, Ohio, for Appellant in 12-4493. Duncan T. Brown, UNITED STATES ATTORNEY'S OFFICE, Cleveland, OH, for Appellee. **ON BRIEF:** Anthony J. Vegh, Cleveland, Ohio, for Appellant in 12-4445. Kevin M. Schad, FEDERAL PUBLIC DEFENDER'S OFFICE, Cincinnati, Ohio, for Appellant in 12-4447. Paul L. Nelson, FEDERAL PUBLIC DEFENDER'S OFFICE, Grand Rapids, Michigan, for Appellant in 12-4448. Dennis Belli, Columbus, Ohio, for Appellant in 12-4493. Duncan T. Brown, UNITED STATES ATTORNEY'S OFFICE, Cleveland, OH, for Appellee.

---

[*]The Honorable William O. Bertelsman, District Judge for the Eastern District of Kentucky, sitting by designation.

1

COLE, J., delivered the opinion of the court with regard to Defendants Wright, Baxter, and Stevens, in which CLAY, J., and BERTELSMAN, D.J., concurred.  CLAY, J. (pp. 22–24), delivered the opinion of the court with regard to Defendant Hayne, in which BERTELSMAN, D.J., concurred.

————————————

**OPINION**

————————————

COLE, Circuit Judge.  In April 2012, Defendants-Appellants Douglas Wright, Brandon Baxter, Connor Stevens, and Anthony Hayne were arrested after they placed explosives at the base of a bridge along Route 82 in Brecksville, Ohio, and attempted to detonate them. Unbeknownst to the defendants, the explosives were inert, and one of their co-conspirators was in fact an FBI informant.  All four defendants pleaded guilty to conspiracy to use a weapon of mass destruction, 18 U.S.C. § 2332a(a)(2)(B) & (D), attempt to use a weapon of mass destruction, § 2332a(a)(2)(B) & (D), and aiding and abetting in malicious use of explosives to destroy a structure used in interstate commerce, § 844(i).  The district court applied a 12-level terrorism enhancement to each defendant's sentence, pursuant to U.S.S.G. § 3A1.4.

All four defendants now challenge the application of the terrorism enhancement, which requires that the offense be "calculated to influence or affect the conduct of government by intimidation or coercion, or to retaliate against government conduct."  18 U.S.C. § 2332b(g)(5)(A).  Additionally, Wright challenges his enhancement for leadership under U.S.S.G. § 3B1.1(c), Baxter challenges the procedural reasonableness of his sentence, and Stevens challenges both the procedural and the substantive reasonableness of his sentence, including the length of his supervised release.  We unanimously affirm the sentences of Wright, Baxter, and Stevens.  Judges Clay and Bertelsman also affirm Hayne's sentence, whereas Judge Cole would vacate Hayne's sentence and remand for resentencing.  Therefore, this opinion is the opinion of the court except as to section II.A.3.

## I. OVERVIEW

### A. Factual Background

The following is a summary of the key facts pertinent to this appeal. Although the district court engaged in extensive fact-finding through briefing and held a hearing on sentencing matters, some facts remained in dispute when the judgments were entered. The following summary makes note of these disputes only if they may be relevant to resolving the issues on appeal.

In the fall of 2011, Wright, Baxter, Stevens, and Hayne were involved to varying extents with the Occupy Cleveland movement ("Occupy"), a loose-knit political group protesting economic inequality. Some individuals affiliated with Occupy, including the four defendants, briefly moved into an abandoned church in Cleveland. In October of 2011, the FBI sent a paid informant—referred to throughout the district court proceedings as the CHS, for "confidential human source"—to an Occupy protest in downtown Cleveland. The CHS was instructed to watch for potentially violent activity. Through this assignment, the CHS met Douglas Wright, and through Wright, the other defendants.

Wright and the CHS had intermittent contact that fall, during which time Wright discussed his interest in escalating his political activities from protesting to more disruptive actions. The CHS offered Wright and Baxter occasional odd jobs and paid them for their work. He then had little contact with Wright and Baxter from November 2011 until February 15, 2012, when Wright and the CHS met to discuss plans to protest during an upcoming NATO/G8 summit in Chicago and considered obtaining riot gear to use there. According to Wright, the CHS gave him $200 to purchase the gear and offered to arrange the sale. Wright, Baxter, and the CHS met again a few days later and discussed the possibility of using stink bombs, explosives, or paint guns in various locations, including the casino in downtown Cleveland. At this point, the FBI decided to begin recording conversations between the CHS and the defendants.

The next significant conversation between the CHS, Wright, and Baxter occurred on March 28, when they met to arrange the sale of riot gear from the CHS's contact. The conversation on this date was lengthy. In relevant portions, the three discussed participating in a

"black block" protest group in Chicago for the purposes of assaulting police officers and protecting other non-violent protestors from police aggression. As they drove, the men discussed the possibility of "taking out a bridge," and Wright observed of a particular structure, "this would be a good one . . . ." Baxter noted that if they were to attack a bridge, the government would respond by placing "security on almost every bridge in the entire [expletive] country." He also raised concerns that attacking a bridge might result in casualties. On that day, the CHS created a recording of Wright and Baxter agreeing to purchase retractable batons and gas masks through the CHS's contact—actually an undercover FBI agent.

Wright, Baxter, the CHS, and, on some occasions, Stevens, met several times in late March and early April. During this period, the group decided to obtain explosives for use in an undetermined scheme, though precisely how this decision was reached remains in dispute. The defendants recount that the CHS relentlessly prodded the group to purchase explosives, until they eventually acquiesced. Nevertheless, Wright's presentence investigation report ("PSR") indicates that, in March, "the idea of obtaining C-4 explosives was brought up," and Wright agreed to participate in a sale of the explosives on April 1, 2012, although he had previously refused to commit to the purchase. Wright did not contest this characterization of the facts in his memorandum objecting to portions of his PSR.

On April 7, the CHS, Wright, Baxter, and Stevens met and discussed, in a noncommittal manner, several potential targets for attack, including a bridge in the Flats area of Cleveland and the Federal Reserve, Fusion Center, and Justice Center buildings downtown. Wright suggested submerging explosives in the Cuyahoga River and then detonating them as cargo ships passed by. He asked the group if it could reach a "consensus" on his plan.

Eventually, the decision was made to use the explosives at the base of the Route 82 bridge in Brecksville, part of the Ohio state highway system. Again, the parties dispute who first suggested the bridge as a target, who made the final proposal to attack the bridge, and when the suggestions and ultimate decision-making occurred. The record, which includes transcripts of several conversations between the CHS and various defendants, does not answer these questions definitively. At a motion hearing, an FBI agent testifying for the government read from

transcripts indicating that, on April 19, Wright suggested placing the C-4 under the bridge after the CHS insisted that Wright's plan to attack a cargo vessel would not work.

The group obtained the explosives on April 29, when the CHS picked up Wright, Stevens, Baxter, and a new companion, Anthony Hayne, and drove them to a motel to meet an undercover FBI agent posing as an arms dealer. (Hayne had been in contact with Wright, Baxter, and Stevens in October of 2011 and claims that Wright suggested that they engage in violent acts at that time. However, Hayne was not drawn into the bridge-bombing plot until April 29.) At the motel, the agent delivered the group two inert C-4 explosive devices, as well as the riot gear that Wright and Baxter had previously ordered, and showed the group how to detonate the devices using a cellular phone. The next day, Wright, Baxter, Stevens, Hayne, the CHS, and a sixth individual named Joshua Stafford drove to the area under the bridge, placed the explosives at the base of a support column, and then absconded to a nearby restaurant, where they attempted to detonate the bombs. According to a contested report prepared by the defendants' explosives expert, even if the C-4 had not been inert, the group had used too little of it to cause anything more than minor damage to the bridge's support piers.

**B. Procedural History**

Wright, Baxter, Stevens, and Hayne were indicted on May 3, 2012, on three charges: conspiracy to use a weapon of mass destruction and attempt to use a weapon of mass destruction, both in violation of § 2332a(a)(2)(B) & (D); and aiding and abetting in malicious use of explosives to destroy a structure used in interstate commerce, in violation of § 844(i). The defendants originally pleaded not guilty. However, Hayne entered a change of plea to guilty on July 25, 2012, and subsequently cooperated with prosecutors. On October 21, Wright, Baxter, and Stevens changed their pleas to guilty on all three counts. As the district court indicated, the defendants opted to plead guilty at least in part because they believed that Hayne's testimony effectively contradicted an entrapment defense.

The PSRs of all four defendants calculated their base offense levels as 24 and added 12 levels for the terrorism enhancement. Additionally, the PSRs recommended a 2-level leadership enhancement for Wright and a 2-level decrease for both Baxter's and Stevens's acceptance of responsibility. Before the sentencing hearings took place, the district court

considered various memoranda from the defendants objecting to material in their PSRs and arguing that the terrorism enhancement should not apply, among other matters. The district court also held a hearing pertaining to the terrorism enhancement and issued a memorandum opinion and order explaining that the enhancement would be applied to Wright, Baxter, and Stevens. These three defendants were sentenced on November 20, 2012.

Hayne's sentencing occurred several days after his co-conspirators'. The court's memorandum regarding the terrorism enhancement did not contain findings specific to Hayne, and this matter was not addressed in any detail at sentencing. Although the court acknowledged Hayne's assistance in testifying for the government, it avoided applying U.S.S.G. § 5K1.1— which authorizes a departure for "substantial assistance" in an investigation or prosecution—on the understanding that doing so would preclude the court from further varying downward based on other factors.

Ultimately, the district court chose to apply substantial downward variances to all defendants' sentences pursuant to 18 U.S.C. § 3553(a). In a memorandum issued after the sentencing hearings concluded, the court explained that it had opted to vary downward on the basis of the inert nature of the explosives, the CHS's role in facilitating the offense, and various individual characteristics of the defendants. Wright was sentenced to 138 months in prison for each offense, significantly below the guidelines range, which the court calculated as 324 to 405 months. Baxter received a sentence of 117 months and Stevens 97 months, also well under the court's guidelines calculations of 262 to 327 months and 188 to 235 months, respectively. At Hayne's hearing, the court acknowledged that a 60-month minimum applied and sentenced Hayne to 72 months, down from a guidelines range of 262 to 327 months. All sentences were concurrent, and all defendants were also sentenced to lifetime supervised release. See 18 U.S.C. § 3583(j); U.S.S.G. § 5D1.2(b)(1).

## II. ANALYSIS

### A. Terrorism Enhancement Under § 3A1.4

Section 3A1.4 of the Sentencing Guidelines authorizes a 12-level enhancement for "a felony that involved, or was intended to promote, a federal crime of terrorism." To define the

phrase "federal crime of terrorism," the guidelines provision directs us to 18 U.S.C. § 2332b(g)(5). *See* § 3A1.4, cmt. n.1. Section 2332b(g)(5) sets forth two requirements for an offense to be considered a federal crime of terrorism: first, the offense must be "calculated to influence or affect the conduct of government by intimidation or coercion, or to retaliate against government conduct," and second, the underlying act must be included within an enumerated list of eligible offenses. This list includes violations of 18 U.S.C. § 844(i) (arson and bombing of property used in interstate commerce) and § 2332a (use of weapons of mass destruction). 18 U.S.C. § 2332b(g)(5)(B)(i).

In order for the sentencing court to apply a terrorism enhancement, the government must show by a preponderance of the evidence that the two requirements of § 2332b have been met. *See United States v. Layne*, 324 F.3d 464, 473 (6th Cir. 2003); *United States v. Graham*, 275 F.3d 490, 517 (6th Cir. 2001). This court determined in *Graham* that the terrorism enhancement can be applied to inchoate offenses, such as attempt and conspiracy. 275 F.3d at 516–17; *see also, e.g.*, *United States v. Mandhai*, 375 F.3d 1243, 1247–48 (11th Cir. 2004) (citing *Graham*). This approach is consistent with the text of § 3A1.4(a), which extends the enhancement to felonies "that involved or [were] *intended to promote*, a federal crime of terrorism," rather than limit its application to only those substantive offenses listed in 18 U.S.C. § 2332b(g)(5)(B). U.S.S.G. § 3A1.4(a) (emphasis added).

We review the district court's legal interpretation of the terrorism enhancement de novo, and we review its factual findings for clear error. *United States v. Fore*, 507 F.3d 412, 414–15 (6th Cir. 2007); *Graham*, 275 F.3d at 513–14. "A factual finding is clearly erroneous when, although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *United States v. Tocco*, 306 F.3d 279, 284 (6th Cir. 2002) (citation and internal quotation marks omitted).

*1. Section 2332b(g)(5) Intent Requirement*

The defendants do not dispute that they were charged with offenses making them eligible for the terrorism enhancement. Rather, they argue that the government has not met its burden of showing that they intended "to influence or affect the conduct of government" or "retaliate against government conduct." 18 U.S.C. § 2332b(g)(5)(A). Specifically, the defendants contend

that they, as members of the Occupy movement, sought to influence corporate behavior or disrupt the lives of the "one percent" but did not target the government specifically.

This court has not yet addressed in detail the meaning of the phrase "calculated to influence or affect the conduct of government."[1] Other circuits have interpreted it as imposing a specific intent requirement. *See, e.g.*, *United States v. Hassan*, 742 F.3d 104, 148–49 (4th Cir. 2014); *United States v. Siddiqui*, 699 F.3d 690, 709 (2d Cir. 2012); *United States v. Chandia*, 395 F. App'x 53, 54, 60 (4th Cir. 2010); *United States v. Stewart*, 590 F.3d 93, 138 (2d Cir. 2009); see also *United States v. Christianson*, 586 F.3d 532, 539–40 (7th Cir. 2009) (noting that a court is to consider the defendant's "purpose" or "motive" in committing the offense). We agree with this interpretation and the general principles developed by the courts that have followed it.

A defendant has the requisite intent if he or she acted with the purpose of influencing or affecting government conduct and planned his or her actions with this objective in mind. *Siddiqui*, 699 F.3d at 709; *Stewart*, 590 F.3d at 137. Long-term planning, however, is not required. *Siddiqui*, 699 F.3d at 709. Nor is it necessary that influencing the government be the defendant's ultimate or sole aim. *United States v. Jayyousi*, 657 F.3d 1085, 1114–15 (11th Cir. 2011); *United States v. Awan*, 607 F.3d 306, 317 (2d Cir. 2010). For example, a defendant who provided material assistance to terrorist organizations, but claimed that his goal was to assist an oppressed group of Muslims, is eligible for the enhancement regardless of his purportedly benign motive. *See Jayyousi*, 657 F.3d at 1114–15.

Furthermore, specific intent may be found even if the record does not contain direct evidence of the defendant's particular frame of mind. *See United States v. Dye*, 538 F. App'x 654, 666 (6th Cir. 2013). In *Dye*, for instance, this court upheld the district court's application of

---

[1]The following Sixth Circuit cases address the terrorism enhancement generally: *United States v. Dye*, 538 F. App'x 654 (6th Cir. 2013) (affirming enhanced sentence of defendant convicted of firebombing bailiff's office); *United States v. Amawi*, 695 F.3d 457 (6th Cir. 2012) (affirming enhanced sentences of defendants engaged in what they defined as jihadi training); *United States v. Assi*, 428 F. App'x 570 (6th Cir. 2011) (holding that the term "government" in § 2332b(g)(5)(A) extends to foreign governments, and finding purported legality of defendant's actions under international law irrelevant to construction of § 2332b); *United States v. Mason*, 410 F. App'x 881 (6th Cir. 2010) (rejecting argument that district court erroneously failed to use its discretion not to apply terrorist enhancement); *United States v. Graham*, 275 F.3d 490 (6th Cir. 2001) (terrorism enhancement applicable to conspiracy to commit offense enumerated at § 2332b(g)(5)(B)).

the enhancement based on its "natural inference" that the defendant's offense—firebombing the office of a judge's bailiff—illustrated that he had the necessary intent. *Id.*

Our sister circuits have upheld application of the terrorism enhancement to defendants who sought to bomb or otherwise violently target government facilities. *See, e.g.*, *United States v. McDavid*, 396 F. App'x 365 (9th Cir. 2010); *In re Terrorist Bombings of U.S. Embassies in E. Africa*, 552 F.3d 93 (2d Cir. 2008); *United States v. Tubbs*, 290 F. App'x 66 (9th Cir. 2008). Similarly, the Eleventh Circuit found the enhancement appropriate for a defendant who plotted to destroy electrical substations "in the hopes that power outages would lead to civil strife" and enable him to demand changes to national foreign policy. *Mandhai*, 375 F.3d at 1248. In contrast, the terrorism enhancement has been held inapplicable to a defendant who aimed to victimize only private persons, even though his actions might have indirectly affected government operations. *See United States v. Leahy*, 169 F.3d 433, 445–48 (7th Cir. 1999) (no evidence of intent to affect government where defendant possessed the highly toxic substance ricin and threatened to poison friends and family members by sending it through the mail).

With these background principles in mind, we turn to the individual defendants to assess whether the district court properly determined, by a preponderance of the evidence, that the intent requirement was satisfied.

*2. Wright, Baxter, and Stevens*

The defendants challenge the factual basis for applying the terrorism enhancement. The district court held that the facts as set forth in the government's sentencing memorandum "clearly establish[], by a preponderance of the evidence, that the terrorism enhancement applies" to Wright, Baxter, and Stevens. It reached this conclusion after holding a hearing regarding the enhancement, at which both sides presented evidence and argument.

We review the facts relied upon by the district court and also look to the record as a whole to determine whether the court committed clear error. *See United States v. Herrera*, 265 F.3d 349, 351 (6th Cir. 2001). The following facts support the district court's determination. First, according to the testimony of co-defendant Anthony Hayne, Wright, Baxter, and Stevens expressed interest in obtaining explosives in November 2011, prior to the CHS's involvement in

the bridge-bombing plot. In his testimony, Baxter denied inquiring about explosives at this time, but we defer to the district court's credibility determinations absent reason to believe that they are clearly erroneous. *See United States v. Esteppe*, 483 F.3d 447, 452 (6th Cir. 2007).

Second, Wright and Baxter expressed interest in participating in a "black block"—which Wright defined as "a group of people that basically beat the [expletive] outta the cops and keep the non-violent protestors from getting beat the [expletive] up by cops"—at the protests to be held during the NATO and G8 summits in Chicago in May 2012. (Tr. 1D6, R. 184-1, PageID 2679.) Wright and Baxter also arranged to purchase gas masks, retractable batons, and canisters of tear gas for use at the Chicago protests or elsewhere.

Third, Wright, Stevens, and Baxter participated in at least one recorded conversation addressing the feasibility of using explosives in or immediately outside government buildings. Wright suggested placing explosives outside of the Federal Reserve building in Cleveland in order to blow up part of the building. Baxter suggested targeting the Northeast Ohio Regional Fusion Center, to which Stevens responded, "Hell ya man, that would be a great [expletive] target." (Tr. 1D11, R. 184-4, PageID 2750.) Both Baxter and Stevens expressed awareness that the Fusion Center was a government facility involved in national security. The record demonstrates that this conversation took place several days after Wright and the CHS decided to acquire explosives.

Fourth, there is evidence to indicate that all three defendants viewed the bombing as a terrorist act, or at a minimum expected that it would be perceived as such. Baxter and Stevens acknowledged that a bridge bombing would likely affect the conduct of government agencies by prompting them to take heightened security measures:

> Baxter: You know that . . . if this is some . . . this happens they're gonna make security on almost every bridge in the entire [expletive] country.
>
> CHS: Yeah.
>
> Wright: No, just the important ones. The really important ones. But I mean, they got the Detroit [Avenue] bridge that would kill a bunch of people.

(Tr. 1D6, R.184-1, PageID 2688.)  Both Wright and Baxter also observed that they expected to be sent to Guantanamo Bay if their bombing scheme was discovered.  Additionally, after the defendants had placed the inert explosives at the base of the bridge, Stevens commented that they had "just committed the biggest act of, only act of terrorism, that I know [of] in Cleveland since the 1960's."  Stevens further characterized the bridge-bombing attempt as a "nice learning experience" for "testing" the capacities of the explosive devices the group had planted or the feasibility of future actions.  (Tr. 1D33, R. 184-7, PageID 2820, 2830–31.)

Viewing this evidence cumulatively, we conclude that it is sufficient to support the district court's application of the terrorist enhancement, even though none of the above facts alone would necessarily be sufficient.  The evidence demonstrates that Wright, Baxter, and Stevens undertook the bridge-bombing plot within a context of plans that they understood to implicate government interests.  They intended to engage in violent protests in Chicago, which—to their minds, at least—would likely involve combat with law enforcement officers.  They considered using explosives to damage two government buildings, although they did not follow through.  They expected that the government would respond to the bridge bombing—that the bombing would "influence or affect" the government—by taking new security measures.  These conversations establish that Wright, Baxter, and Stevens were aware of the consequences of their acts and chose to act in ways that would bring about those consequences, even if they had other goals in mind, such as antagonizing the "one percent."  The district court did not err in applying the enhancement.

### 3. *Hayne*

We have reason to consider Hayne's case separately.  First, as a latecomer to the conspiracy, Hayne did not participate in the conversations evincing an intent to affect the conduct of the government.  Second, the district court did not explicitly identify the facts upon which it based Hayne's enhancement for terrorism, other than to indicate at his sentencing hearing that it had considered the question "at great length" in determining the sentences of Wright, Baxter, and Stevens.  Because I believe that the district court did not adequately explain its basis for applying the enhancement to Hayne, I would vacate his sentence and remand for resentencing.

I first look to the record to determine whether there is sufficient evidence of Hayne's intent. Because Hayne was not a participant in most of the CHS's recorded conversations, the main source of information about Hayne's involvement comes from his own testimony as a prosecution witness.

Hayne testified that he met Wright in October 2011, that they temporarily lived in an abandoned church together, and that Wright demonstrated an interest in explosives and was considering setting off bombs in the church building. He also recounted that Wright had asked him if he knew where to obtain explosives. In early November, Hayne was arrested on charges unrelated to this case and remained in jail until January 3, 2012. As a result, he lost contact with Wright and the others. When Hayne reconnected with Wright and Baxter in March, he learned that they had some sort of violent plan and that they had scoped out an undisclosed location. But Hayne testified that he did not know any details of the bombing plot until Wright informed him on April 29, the day before the attempted detonation.

Hayne's testimony alone is not sufficient to establish that he understood the bridge bombing as part of a plot intended to affect or disrupt the government. On direct examination, Hayne explained that he believed the purpose of the scheme to be to "stop the transportation of the [one] percent." He also made a similar claim in a signed statement to the FBI shortly after his arrest, in which explained that he understood the bombing to have "something to do with May Day, like the general strike and stopping people from going to work and something like that." (Mot. Hr'g, R. 179, PageID 2459, 2464–65.) The district court did not explicitly discredit this testimony, though, if it had, we would show deference to such a credibility determination. *See Esteppe*, 483 F.3d at 452.

In light of this evidence, it is not clear how the district court arrived at its conclusion that Hayne possessed the necessary intent. The court might have inferred such intent from the offense itself, might have discredited Hayne's testimony regarding his motives and limited knowledge of the plot, or might have imputed to Hayne the intent of his co-conspirators. *See* U.S.S.G. § 1B1.3(a)(1)(B) ("relevant conduct" guideline); *but see Stewart*, 590 F.3d at 138–39 (holding that a mental state is not "relevant conduct" for purposes of applying the terrorism enhancement). These methods might, or might not, have been sufficient to find that Hayne had

the required intent. Without an explanation, we cannot determine whether the district court's legal interpretation of the sentencing guidelines was correct—a question that we review de novo. *See Fore*, 507 F.3d at 414.

A court commits procedural error if it fails to adequately explain a chosen sentence. *Gall v. United States*, 552 U.S. 38, 51 (2007). In this case, the lack of explanation was not harmless error. *See United States v. Vandeberg*, 201 F.3d 805, 810, 812 (6th Cir. 2000). Hayne's guidelines-range sentence was four times longer with the enhancement than without it. Although the district court then applied a substantial downward variance, we cannot know what sentence Hayne would have received if the court had engaged in a more complete legal and factual analysis that accounted for the differences between Hayne and the other defendants. Thus, I would vacate Hayne's sentence and remand for resentencing.

**B. Wright's Leadership Enhancement Under § 3B1.1(c)**

Wright appeals the district court's 2-level enhancement for his role in the offense as an organizer, leader, manager, or supervisor of criminal activity. U.S.S.G. § 3B1.1(c). Wright's PSR recommended this enhancement on the basis that Wright served as the group's leader by enlisting the other defendants in the scheme, making contact with the CHS, first proposing that the group use explosives, and selecting the Route 82 bridge as the group's target. The district court's decision to apply the leadership enhancement appears to have been based at least in part on its adoption of the facts provided in Wright's PSR. However, the court also held a hearing in order to clarify facts relevant to sentencing, at which an FBI agent and defendants Baxter and Hayne testified.

At sentencing, Wright objected generally to the facts contained in the final PSR and to the leadership enhancement. He now contends that the PSR contained three key inaccuracies: (1) that Wright had recruited the other defendants into the conspiracy and initiated contact with the CHS, (2) that Wright was the first person to mention making plastic explosives, and (3) that Wright chose the bridge as the group's target "after doing independent research." Wright further argues that the only true leader of the conspiracy was the CHS, as he arranged the sale of riot gear and explosives, provided transportation to the defendants, and consistently encouraged them to pursue the bridge-bombing scheme.

We review for clear error the district court's factual determinations pertaining to the leadership enhancement. *See United States v. McDaniel*, 398 F.3d 540, 551–52 & n.10 (6th Cir. 2005); *United States v. Beard*, 394 F. App'x 200, 204–05 (6th Cir. 2010). The court's legal determinations are subject to "deferential" review. *See United States v. Washington*, 715 F.3d 975, 983 (6th Cir. 2013) (addressing uncertainty regarding the correct standard). The prosecution bears the burden of proving leadership by a preponderance of the evidence. *Vandeberg*, 201 F.3d at 811.

To receive an enhancement for one's role in the offense, a defendant "must have been the organizer, leader, manager, or supervisor of one or more other participants." U.S.S.G. § 3B1.1 cmt. n.2. To determine whether a defendant's involvement qualifies, courts are to consider "the exercise of decision making authority, the nature of participation in the commission of the offense, the recruitment of accomplices, . . . the degree of participation in planning or organizing the offense, the nature and scope of the illegal activity, and the degree of control and authority exercised over others." *Id.* at cmt. n.4. More than one person may qualify as a leader or organizer. *Id.* However, "[m]erely playing an essential role in the offense is not equivalent to exercising managerial control over other participants." *Vandeberg*, 201 F.3d at 811.

Despite the existence of some disputed facts regarding Wright's role in the offense, our review of the record leads us to conclude that the district court did not erroneously apply the leadership enhancement. Hayne testified under oath that Wright had introduced him to the CHS, spoke with him about obtaining explosives in November of 2011, and told him about the plan to place the explosives beneath the Route 82 bridge. At the same hearing, Baxter testified that Wright had encouraged the group to come to a "consensus" on their plan—which consisted, at the time, of targeting a cargo ship by placing C-4 underwater and detonating it as a ship approached. Although Wright's plan was not carried out, this evidence supports the district court's interpretation that Wright acted as coordinator and sought the participation and agreement of the others. Additionally, an FBI agent working with the CHS testified that Wright suggested that the group meet "every couple of days," and directed other defendants to set up "secure" email accounts and to access online forums to facilitate planning. Baxter's testimony, as well as the FBI agent's, is corroborated by transcripts of conversations recorded by the CHS.

Wright's main arguments against the application of the leadership enhancement are largely beside the point. Although the CHS's involvement may have been equal to, or even greater than, Wright's, a defendant does not need to have been the sole leader to qualify for an enhancement. *See United States v. Vasquez*, 560 F.3d 461, 473 (6th Cir. 2009). And, as the district court repeatedly pointed out, Wright and his co-defendants pleaded guilty, forgoing an opportunity to argue that the CHS had entrapped them. Nor is Wright ineligible for the enhancement on the basis that he initially declined to acquire C-4 explosives, that he did not know how to use C-4, or that he repeatedly stated that he wished to avoid civilian casualties, since none of these claims—even taken as true—are relevant to the question of Wright's role relative to his co-defendants. Ultimately, although Wright's precise degree of leadership may be open to debate, the district court's decision to apply the 2-level enhancement was not clearly erroneous on the evidence before it.

**C. Procedural and Substantive Reasonableness**

Baxter and Stevens challenge the procedural reasonableness of their sentences, and Stevens also claims that his sentence was substantively unreasonable. In reviewing the reasonableness of a sentence, we use a "deferential abuse-of-discretion standard." *United States v. Alexander*, 543 F.3d 819, 821 (6th Cir. 2008). First, we ensure that the district court has committed no procedural error. A sentence is procedurally unreasonable if the sentencing court committed such errors as "improperly calculating [] the Guidelines range, treating the Guidelines as mandatory, failing to consider the § 3553(a) factors, selecting a sentence based on clearly erroneous facts, or failing to adequately explain the chosen sentence," *Gall*, 552 U.S. at 51, or if a court failed to "consider all non-frivolous arguments in support of a lower sentence," *United States v. Gunter*, 620 F.3d 642, 645 (6th Cir. 2010); *see also United States v. Bolds*, 511 F.3d 568, 580–81 (6th Cir. 2007). We employ the clear error standard to review factual determinations and the de novo standard to review legal ones. *Bolds*, 511 F.3d at 579.

If we are satisfied that a sentence is procedurally reasonable, we may then consider its substantive reasonableness. This court finds a sentence substantively unreasonable "if the district court selects a sentence arbitrarily, bases the sentence on impermissible factors, fails to consider relevant sentencing factors, or gives an unreasonable amount of weight to any pertinent

factor." *United States v. Camiscione*, 591 F.3d 823, 832 (6th Cir. 2010) (citation omitted). Sentences that fall within the properly calculated guidelines range are presumptively considered reasonable, though the presumption can be rebutted. *United States v. Vonner*, 516 F.3d 382, 389–90 (6th Cir. 2008) (en banc).

If a party fails to object to a perceived error at sentencing after being afforded the opportunity to do so, we review the claim for plain error only. To prevail, then, the party must demonstrate that the district court committed a clear or obvious error that affected his substantial rights as well as the "fairness, integrity, or public reputation of the judicial proceedings." *Id.* at 386.

### 1. Baxter's Claim of Procedural Unreasonableness

Baxter argues that his sentence is procedurally unreasonable because the district court failed to address various objections he raised to purported inaccuracies in his PSR. He claims that correction of these errors would have led the district court to determine that the terrorism enhancement did not apply. Specifically, Baxter objected that the PSR incorrectly identified March 28, 2012, as the date when the group decided to target a bridge and erroneously described him as "the first person to mention blowing up a bridge." He further objected that the PSR omitted facts demonstrating that the CHS badgered Baxter into agreeing to the purchase of C-4 explosives, that the CHS ultimately selected the bridge as the target, and that Baxter was not involved in the decision to use the C-4 on the Route 82 bridge but went along with the plan that others had concocted. Lastly, he objected to the PSR's determination that the government was the intended victim of the bombing scheme. Baxter addressed the alleged discrepancies in a memorandum filed within fourteen days of receiving the PSR. *See* Fed. R. Crim. P. 32(f)(1). He also raised the same objections at sentencing, to which the court replied, "Very well. Those objections have been considered and are denied."

Baxter further claims that the court failed to comply with Federal Rule of Criminal Procedure 32(i)(3)(B), which states, "[a]t sentencing, the court: . . . must—for any disputed portion of the presentence report or other controverted matter—rule on the dispute or determine that a ruling is unnecessary because the matter will not affect sentencing, or because the court will not consider the matter in sentencing." Rule 32 requires a defendant to raise his objections

during the sentencing hearing. *United States v. White*, 492 F.3d 380, 415 (6th Cir. 2007). Following the objection, "the court may not merely summarily adopt the factual findings in the presentence report or simply declare that the facts are supported by a preponderance of the evidence. Rather, the district court must affirmatively rule on a controverted matter where it could potentially impact the defendant's sentence." *Id.* (internal citations and quotation marks omitted); *see also United States v. Vanhoose*, 446 F. App'x 767, 769 (6th Cir. 2011). Rule 32 requires the court's "literal compliance." *White*, 492 F.3d at 415. However, Rule 32 errors are subject to harmless error review, whereby a sentence may stand only if the reviewing court is "certain that the error did not cause the defendant to receive a more severe sentence." *United States v. Quail*, 513 F. App'x 559, 563 (6th Cir. 2013) (citing *United States v. Roberge*, 565 F.3d 1005, 1011 (6th Cir. 2009)).

We first address Baxter's argument that the court failed to resolve factual disputes regarding the CHS's role in facilitating the offense. This claim fails for two reasons: first, the court heard testimony and argument regarding the CHS's conduct at a hearing that took place before sentencing, and second, the court repeatedly stated that it did not believe the CHS to be responsible for the defendants' actions, particularly in light of their decision to plead guilty. At the aforementioned hearing, the court responded to a line of questioning regarding the CHS's role by observing that the defendants "did not follow the defense of entrapment" and then commented that the case "[was] not about the CHS's record." Nevertheless, the court explicitly cited the CHS's conduct in explaining its decision to grant Baxter a substantial downward departure from the guidelines range. The record, then, establishes that the court considered the CHS's role generally but did not resolve specific factual disputes regarding the CHS's actions and statements because it did not find these discrete issues relevant to Baxter's sentencing. *See* Fed. R. Crim. P. 32(i)(3)(B); *see also United States v. Darwich*, 337 F.3d 645, 666 (6th Cir. 2003) ("[C]ontroverted matters at sentencing only require a ruling if the disputed matter will affect the eventual sentence.").

Baxter also objected to various characterizations of his own role in the plot, specifically his contributions to the group's decision to acquire C-4 explosives and to target the Route 82 bridge. Baxter correctly notes that the court did not issue particular findings or rulings on these

factual disputes. It did not reach a clear determination as to who first suggested purchasing explosives or planting them under the bridge, or when exactly these decisions were made, as its recitation of the facts in Baxter's sentencing memorandum illustrates. The court may have determined that these objections were irrelevant—for example, that enough evidence existed of Baxter's intent irrespective of the disputed facts—but it neglected to say as much.

Nevertheless, the court's error was harmless. *See Quail*, 513 F. App'x at 563; *Darwich*, 337 F.3d at 666. Even if these factual disputes had been resolved in Baxter's favor, the court still would have had enough evidence to apply the terrorism enhancement. In its memorandum explaining the applicability of the enhancement to Wright, Baxter, and Stevens individually, the court pointed to ample evidence that Baxter did not dispute in his objections to the PSR. The court's decision to apply the enhancement in no way rested on an assumption or finding that Baxter was (as the allegedly erroneous PSR paragraph indicates) the first defendant to mention targeting a bridge; nor did it require the court to find that Baxter had participated in any discussion in which the bridge scheme was definitively adopted. In the context of the record as a whole, the district court's failure to respond to Baxter's specific factual objections was harmless because we are assured that Baxter did not receive a more severe sentence as a result.

As for Baxter's last objection—to the PSR's characterization of the government as the offense's victim—we find that the court adequately addressed this matter by holding a hearing regarding the terrorism enhancement and by issuing a 36-page memorandum opinion concluding that both the law and the facts supported its application. Rule 32 serves to ensure that a court does not "summarily adopt the factual findings in the PSR or simply declare that the facts are supported by a preponderance of the evidence." *Vanhoose*, 446 F. App'x at 769 (citation omitted). The district court did neither in applying the terrorism enhancement. Baxter's sentence is affirmed.

### 2. *Stevens's Claim of Procedural and Substantive Unreasonableness*

Stevens claims that the district court improperly calculated his sentence and erroneously applied the terrorism enhancement, resulting in a procedurally and substantively unreasonable sentence. Stevens's first argument appears to be simply that the district court improperly calculated his sentence because it did not impose only the 60-month minimum required by

18 U.S.C. § 844(i). Stevens does not argue that the district court failed to account for the § 3553(a) factors or based the sentence on erroneous facts. *See Gall*, 552 U.S. at 51. To the extent that Stevens attempts to argue something other than that the terrorism enhancement should not apply, the cursory discussion contained in his brief is insufficient to present a claim to this court. *See McPherson v. Kelsey*, 125 F.3d 989, 995–96 (6th Cir. 1997).

Next, Stevens contends that his sentence is procedurally or substantively unreasonable because the court failed to explain its decision to impose lifetime supervised release. *See* 18 U.S.C. § 3583(j) ("[T]he authorized term of supervised release for any offense listed in section 2332b(g)(5)(B) is any term of years or life."); U.S.S.G. § 5D1.2(b)(1) (authorizing term of supervised release "up to life" for "any offense listed in 18 U.S.C. § 2332b(g)(5)(B), the commission of which resulted in, or created a foreseeable risk of, death or serious bodily injury to another person."). Stevens further suggests that the district court may have believed lifetime supervised release to be mandatory. We reject this argument, noting that at Baxter's sentencing hearing, held only hours before Stevens's, the court indicated that it had discretion to impose the lifetime term.

Turning to the sufficiency of the district court's reasoning, at sentencing, Stevens's attorney asked the judge "to consider not imposing" lifetime supervision. When the court did in fact impose the lifetime term, Stevens's attorney made a general objection to his client's sentence but did not specifically challenge the imposition of lifetime supervised release. However, the district court appeared to invite a general objection, as it asked Stevens's attorney whether there was "anything further [he] want[ed] to put on the record" and then immediately followed this question by stating, "You can object to all my findings and keep that in the record." At this point, counsel responded, "I'll just state for the record I object."

Assuming that this objection is sufficient, the district court did not abuse its discretion, much less plainly err, in assigning Stevens lifetime supervised release. Although the court did not explain its reasoning for the term of supervised release at sentencing, it filed an 18-page memorandum opinion the following day in which it enumerated and considered the 18 U.S.C. § 3553(a) sentencing factors. *See United States v. Rossi*, 422 F. App'x 425, 437 (6th Cir. 2011) (considering court's "discussion at sentencing and its written sentencing memorandum" in

holding sentence procedurally reasonable); *see also Vonner*, 516 F.3d at 386 (suggesting that court's decision to deny request for downward variance may be adequately addressed in a "written sentencing memorandum"). We again note that the court reached its conclusions after ample opportunity for fact-finding afforded by briefing and a pre-sentencing hearing. Specifically, the court considered the seriousness of the offense, Stevens's history of promoting violent anti-government rhetoric, and comments Stevens made after placing the explosives indicating that he wished to pursue similar destructive acts in the future. The court also remarked on Stevens's "absence of . . . any educational ambition, coupled with his drug addiction," noting that it had "concern as to the future actions of the defendant once he has served his sentence." While the court's discussion of supervised release *in particular* was brief, its treatment of the sentencing factors *overall* was not, and we are satisfied that the court gave adequate consideration to the interests served by pairing a below-guidelines sentence with lifetime supervised release—namely, protecting the public from future, and potentially grave, criminal acts, and deterring Stevens from drug abuse after his release. *Cf. United States v. Deen*, 706 F.3d 760, 765–66 (6th Cir. 2013) (contrasting permissible objectives of imprisonment versus supervised release). The court did not neglect to consider the requisite factors, fail to explain its reasoning, or choose the sentence arbitrarily. *See Gall*, 552 U.S. at 51; *United States v. Webb*, 403 F.3d 373, 385 (6th Cir. 2005).

Finally, Stevens claims that his sentence is substantively unreasonable because the court impermissibly considered the length of supervised release in determining its downward variance. For support, Stevens cites *United States v. Johnson*, in which the Supreme Court held that excess time served in prison cannot be applied to reduce one's term of supervised release. 529 U.S. 53, 59–60 (2000). However, Stevens does not cite any cases suggesting that a court cannot consider the availability of supervised release in determining an offender's prison sentence, or vice versa. Such a consideration is not arbitrary or unreasonable. *See Camiscione*, 591 F.3d at 832. Rather, it comports with the individualized determinations that 18 U.S.C. § 3553(a) requires a court to make. Thus, the district court neither abused its discretion nor engaged in plain error. *See Alexander*, 543 F.3d at 822. We affirm Stevens's sentence.

## III.  CONCLUSION

The sentences of Wright, Baxter, and Stevens are affirmed.  For the reasons addressed in Judge Clay's opinion, the court also affirms Hayne's sentence.

---

**OPINION**

---

CLAY, Circuit Judge, concurring in part and announcing the judgment as to Defendant Anthony Hayne. I agree with Judge Cole that Defendants Wright, Baxter, and Stevens qualify for the terrorism enhancement of U.S.S.G. § 3A1.4, and I concur in affirming their sentences. Furthermore, the district court did not err in applying the terrorism enhancement to Defendant Hayne. We therefore **AFFIRM** his sentence as well.

Hayne met Wright six months before the attempted bombing of the Route 82 bridge. Within a few weeks of meeting, Wright was telling Hayne about plans to bomb buildings and bridges. For one of these plots, Wright discussed "creating a distraction on the Detroit-Superior Memorial Bridge in order to draw police from downtown Cleveland, and then, in the absence of police, committing violent acts." (R. 228, Hayne Sentencing Op., at 3392–93.) Hayne thought these plots were "kind of cool." (R. 179, Sentencing Hrg. Tr., at 2455.) In early November 2011, Wright asked Hayne if he knew how to procure explosives. At around the same time, Hayne was building and detonating smoke bombs—something Wright derided as "pussy shit." (*Id.* at 2457.) Wright and Baxter told Hayne just a month before the bombing about another plot they had in the works, albeit in vague terms.

On April 29, 2013, Hayne accompanied Wright, Baxter, and the "confidential human source" to a hotel room where they purchased two bombs from what turned out to be an undercover FBI agent. But the agent delivered more than bombs—he also gave the group ballistic vests, smoke grenades, and gas masks that Wright and Baxter had previously ordered. The next day, Hayne acted as lookout while his codefendants planted the bombs on a support column of the Route 82 bridge. Once the devices had been planted, Stevens told the others "This is the biggest act of terrorism in Cleveland since the 1960s." (Hayne Sentencing Op. at 3394.) Hayne and his codefendants then drove to an Applebee's and attempted to blow up the bridge.

Based on these facts, the district court did not clearly err when it applied the terrorism enhancement of U.S.S.G. § 3A1.4 to Hayne. To briefly summarize the applicable standard,

§ 3A1.4 applies to two categories of offenses:  (1) felonies that "involved . . . a federal crime of terrorism"; and (2) felonies that were "intended to promote[] a federal crime of terrorism."  The statutory definition of "federal crime of terrorism" has two elements, and the government must establish both by a preponderance of the evidence:  (1) the offense must be "calculated to influence or affect the conduct of government by intimidation or coercion, or to retaliate against government conduct;" and (2) the offense must be one of the crimes listed in the statute. 18 U.S.C. § 2332b(g)(5).

The first category in § 3A1.4 is applicable to cases like the one before us now—cases where the crimes of conviction are found among the enumerated terrorism offenses of 18 U.S.C. § 2332b(g)(5)(B).  *See United States v. Graham*, 275 F.3d 490, 516 (6th Cir. 2001).  The second category in § 3A1.4 applies when the defendant's crime of conviction is not one of the enumerated terrorism offenses.  In these cases, the government must prove by a preponderance of the evidence that "the defendant has as one purpose of his substantive count of conviction or his relevant conduct the intent to promote a federal crime of terrorism." *Id.*  Whichever § 3A1.4 category applies, the government must also prove by a preponderance of the evidence that the defendant's offense was "calculated to influence or affect the conduct of government by intimidation or coercion, or to retaliate against government conduct."  18 U.S.C. § 2332b(g)(5)(A).  We now hold that this element requires the government to prove that the defendant specifically intended to influence or affect the conduct of government, and that a "defendant has the requisite intent if he or she acted with the purpose of influencing or affecting government conduct and planned his or her actions with this objective in mind." *Supra* at 9.  We do not require that this intent be the defendant's only purpose in committing the offense.  So long as the defendant intended to influence to conduct of government, the terrorism enhancement will apply even if the defendant also harbored other motivations, such as an intent to gain financial reward or impress a sweetheart.  *See United States v. Awan*, 607 F.3d 306, 316–18 (2d Cir. 2010).

The specific intent standard we announce today is a legal issue concerning the proper construction of the Guideline and the statute.  However, whether a defendant "actually harbored such an intent is a question of fact." *United States v. Reaume*, 338 F.3d 577, 583 (6th Cir. 2003).

We review the district court's finding that the requisite intent existed for clear error. *See Graham*, 275 F.3d at 513–14, 518–19. "Based on our review of the record, we cannot say that the district court's findings of fact are clearly erroneous." *Id.* at 518.

Hayne is correct that he came into the plot to blow up the Route 82 bridge relatively late in the day. But the record shows Hayne knew that this bombing was part of a larger scheme, of which Wright was the mastermind. Wright had told Hayne about plans to bomb other major pieces of infrastructure. Hayne saw the undercover agent deliver gear that would be used for future acts of terrorist violence—not the Route 82 bridge bombing. Hayne testified that the goal of destroying the Route 82 bridge was to "[s]top the transportation of the 1 percent" (Sentencing Hrg. Tr. at 2459), but the coconspirators did not choose to spark class conflict by attacking a private installation. *Cf. United States v. Tankersley*, 537 F.3d 1100, 1107 n.7 (9th Cir. 2008) (noting that the district court had not applied the terrorism enhancement where the target was a private facility and the bombers' communiqué spoke only of corporate greed). A district court need not wait for the defendant to confess a specific intent to influence the government. The court can find this intent based on circumstantial evidence and reasonable inferences from the facts presented. *See supra* at 9–10. The record in this case establishes that Hayne knew his coconspirators were engaged in a larger scheme of terrorist violence. Knowing this, Hayne decided to join the conspiracy to blow up the Route 82 bridge. The district court did not clearly err when it determined that Hayne personally intended to influence or affect the conduct of government by destroying this major piece of government infrastructure. *See United States v. El-Mezain*, 664 F.3d 467, 571 (5th Cir. 2011); *United States v. Hammoud*, 381 F.3d 316, 356 (4th Cir. 2004), *vacated on other grounds*, 543 U.S. 1097 (2005); *United States v. Mandhai*, 375 F.3d 1243, 1248 (11th Cir. 2004).

For these reasons, the district court's sentence of Hayne is **AFFIRMED**.