**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**
_____

UNITED STATES OF AMERICA,

    Plaintiff - Appellee,

v.

DAVID MICHAEL ANSBERRY,

    Defendant - Appellant.

No. 19-1048

_____

**Appeal from the United States District Court**
**for the District of Colorado**
**(D.C. No. 1:16-CR-00341-CMA-1)**
_____

Kathleen Shen, Assistant Federal Public Defender (Virginia L. Grady, Federal Public Defender, with her on the briefs), Denver, Colorado, for Defendant-Appellant.

Marissa R. Miller, Assistant United States Attorney (Jason R. Dunn, United States Attorney, with her on the brief), Denver, Colorado, for Plaintiff-Appellee.
_____

Before **LUCERO**, **McHUGH**, and **EID**, Circuit Judges.
_____

**McHUGH**, Circuit Judge.
_____

    This criminal appeal arises from Defendant David Ansberry's attempt to detonate a bomb in front of the Nederland, Colorado police station. Mr. Ansberry pleaded guilty to use or attempted use of a weapon of mass destruction against a

person or property in the United States, in violation of 18 U.S.C. § 2332a(a)(2). At sentencing, the parties disputed the application of three provisions contained in the United States Sentencing Guidelines: (1) whether Mr. Ansberry knowingly created a substantial risk of death or serious bodily injury to another person, which under U.S.S.G. § 2K1.4(a)(1) would create a base offense level of twenty-four; (2) whether the individual officers who came into contact with the bomb were victims, which under U.S.S.G. § 3A1.2(a) would increase Mr. Ansberry's offense level by three; and (3) whether Mr. Ansberry's offense involved a federal crime of terrorism because it was calculated to retaliate against government conduct, which under U.S.S.G. § 3A1.4 would increase his offense level by twelve and convert his criminal history category from I to VI. After holding a three-day sentencing hearing and taking testimony from ten witnesses, the district court sided with the government on all three provisions and sentenced Mr. Ansberry to 324 months in prison.

On appeal, Mr. Ansberry challenges application of each of the three guidelines provisions. We conclude the district court did not err in applying the § 2K1.4(a)(1) base offense level because the court found that Mr. Ansberry actually created a risk of death or serious bodily injury, and this finding was not clearly erroneous. But we agree with Mr. Ansberry that the court erred in applying the § 3A1.2(a) official-victim enhancement because the court impermissibly relied on relevant conduct rather than on the facts immediately related to his offense of conviction. And we agree with Mr. Ansberry that the district court erred in applying the § 3A1.4 terrorism enhancement. The court applied the terrorism enhancement on the ground

2

that Mr. Ansberry's offense was calculated to retaliate against government conduct, but the court expressly refused to determine whether the conduct Mr. Ansberry retaliated against was objectively government conduct. The court presumably did so because it thought the enhancement applied so long as a defendant subjectively believed the conduct he retaliated against was government conduct. We hold that, for a § 3A1.4 terrorism enhancement based on the defendant's retaliation against government conduct to apply, the conduct retaliated against must objectively be government conduct. We accordingly vacate Mr. Ansberry's sentence and remand for resentencing.

## I.  BACKGROUND

### A.  *Events in Nederland, Colorado*

The events underlying this case began nearly half a century ago. In 1971, at the age of nineteen, Mr. Ansberry arrived in Nederland, Colorado. There, he became involved with a group of "hippies" camped outside the town, who referred to themselves with the acronym STP (likely standing for Serenity, Tranquility, and Peace) and used stickers and patches with the well-known logo of STP, the motor-oil and fuel-additive brand. Mr. Ansberry became close friends with a particular STP member named Guy Goughnor, another nineteen-year-old, who went by the nickname Deputy Dawg.

In July 1971, Mr. Goughnor and other STP members were drinking at the bar of the Pioneer Inn in Nederland, when the bar owner called the town's marshal, Renner Forbes, to remove them for creating a disturbance. After arriving, Marshal

3

Forbes "thr[e]w [Mr.] Goughnor into the rear of the Nederland Police vehicle," "ma[d]e statements to Mr. Goughnor about leaving town and never coming back or else," and drove off. R. vol. VI at 154. Mr. Goughnor was never seen alive again, and his body was recovered approximately one month later in a remote canyon with a gunshot wound to the head.

Marshal Forbes became the primary suspect in the Boulder County Sheriff's Department's investigation into Mr. Goughnor's death. While investigators believed they could "establish[] definite probable cause pointing to [Marshal] Forbes" based on circumstantial evidence, they did not obtain his confession or locate physical evidence linking him to the killing. R. vol. VI at 155. They closed the investigation in November 1971, without bringing charges against anyone for Mr. Goughnor's death.

Although he was not charged, Renner Forbes lost his commission as a marshal and moved to Kansas shortly after the discovery of Mr. Goughnor's body. In 1996, over twenty-five years later, Mr. Forbes, then sixty-eight years old and living in a nursing home, confessed to killing Mr. Goughnor and later pleaded guilty to manslaughter. He was sentenced to probation due to his health and died two years later.

Twenty years after Mr. Forbes confessed to killing Mr. Goughnor, Mr. Ansberry felt "compelled to action." R. vol. II at 115. In August 2016, Mr. Ansberry arrived by bus in Nederland and immediately visited the Pioneer Inn, where Mr. Goughnor was last seen alive. He struck up a conversation with a waitress there and told her that he was in town "to take care of some old business." R. vol. VIII at 185.

4

According to his journal, Mr. Ansberry continued to visit the Pioneer Inn, writing in one entry, "Pioneer Inn. Life goes on. No one remember[s] what happened in 71. Poor Deputy. REVENGE is called for." *Id.* at 266 (quotation marks omitted).

Mr. Ansberry built a bomb consisting of, among other items, a small light bulb, a cell phone, and a glass jar filled with an explosive powder called hexamethylene triperoxide diamine ("HMTD"). HMTD is a compound that bomb-makers must organically synthesize because its volatility makes it too dangerous for commercial or military use. It is extremely sensitive to heat, friction, and impact, meaning that, depending on quantity and purity, it can detonate at the slightest touch or movement. HMTD can degrade over time into chemicals that are no longer explosive. The degradation process causes heat, which itself may result in detonation of any remaining viable HMTD.

Mr. Ansberry placed his bomb in a duffle bag. In the bag, he also included a second, empty glass jar along with its lid and seal, and two metal pie pans. These items were not part of the bomb, but they could break apart and become shrapnel in an explosion. The bomb was designed so that a call to the cell phone would trigger it.

Mr. Ansberry spent the night of October 10, 2016, in Nederland in a hotel room with a view of a two-story shopping complex. The Nederland police station is located on the bottom level of the complex. On October 11, 2016, sometime before 4:45 a.m., Mr. Ansberry placed the duffle bag with the bomb inside it in front of the Nederland police station next to a sign marked "Police Parking Only" and left the

5

area. Mr. Ansberry then called the cell phone five times and texted it twice between 4:55 and 5:15 a.m., but the bomb did not explode.

Officer Darragh O'Naullain arrived at the police station roughly two hours later at 7:00 a.m. and noticed the duffle bag sitting beside the sign. After giving the bag a cursory feel and sensing nothing suspicious, Officer O'Naullain left the bag where he found it and went to get his morning coffee. When Officer O'Naullain returned fifteen minutes later and the bag was still there, he took it into the police station and left it under a chair in the entryway. He inspected the bag shortly before 8:00 a.m. and discovered the bomb. Officer O'Naullain left the bag in the entryway, and he and two other officers evacuated eight to ten people who had since arrived at the complex.

Bomb technicians from local and federal agencies arrived and, over the course of the day, worked to neutralize the bomb. Using a robot, they retrieved the duffle bag from inside the police station, pulled the contents out of it, and dumped them nearby in the parking lot. During this process, the bomb—including the glass jar containing HMTD—was swung about, banged against the robot's camera, pulled out of the bag, and dropped onto pavement. It did not explode. Bomb technicians also emitted a laser at the glass jar to determine its contents. After determining that the jar contained HMTD, the technicians placed sandbags around the jar and fired a steel slug into it, causing the contents to explode. The explosion ripped the sandbags to shreds.

Federal agents later arrested Mr. Ansberry at a Chicago airport. They found two STP stickers in his luggage. These stickers matched an STP sticker investigators found affixed to the window of a business that shares a wall with the Nederland police station, on which Mr. Ansberry had written, "RIP Deputy Dawg. 7-17-71. Murdered by Town Marshal." R. vol. I at 281–85; R. vol. VIII at 253–54.

### B. District Court Proceedings

A grand jury indicted Mr. Ansberry on one count of use or attempted use of a weapon of mass destruction against a person or property in the United States in violation of 18 U.S.C. § 2332a(a)(2). Mr. Ansberry notified the district court that he intended to plead guilty, without a plea agreement, to the sole count in the indictment. In his written plea statement, he defined the elements of the offense as the "*attempt* to use" a statutorily-defined destructive device "against *property* within the United States." R. vol. I at 124 (emphasis added). As a factual basis for his plea, Mr. Ansberry admitted, in relevant part:

> Between 4:56 a.m. and 5:14 a.m. on October 11, 2016, [Mr.] Ansberry made several calls on a cellular phone in an attempt to detonate a small destructive device that was in a backpack outside of the police station in Nederland, Colorado. The device failed to detonate. . . . [T]he destructive device was not intended to cause casualties or mass destruction.

*Id.* at 125–26.

At the plea hearing, Mr. Ansberry acknowledged he was charged in the indictment with a violation of 18 § U.S.C. 2332a and confirmed he was pleading guilty to that charge. He also confirmed that his and the government's factual bases

7

for the guilty plea differed and that he was admitting to only the facts set out in his own statement. He further explained he was pleading guilty to "attempting to detonate a destructive device in a deserted shopping center between 4:55 a.m. and 5:15 a.m.[,] . . . which was not capable of causing mass destruction[ or] mass casualties." R. vol. IX at 87–88. When asked to state the elements of the offense, the prosecutor employed Mr. Ansberry's version of them, stating that the government would have to prove Mr. Ansberry attempted to use a destructive device against property within the United States.[1] Mr. Ansberry then pleaded guilty to the charge in the indictment, and the district court adjudged him guilty of a violation of § 2332a(a)(2) as charged in the indictment.

At sentencing, there were three main disputes, all regarding application of the sentencing guidelines. First, the government argued that Mr. Ansberry's base offense level was twenty-four under U.S.S.G. § 2K1.4(a)(1) because the offense involved the attempted destruction of a government facility or place of public use or, alternatively, because Mr. Ansberry knowingly created a substantial risk of death or serious bodily injury to a person other than himself. *See* U.S.S.G. § 2K1.4(a)(1). Mr. Ansberry argued that § 2K1.4(a)(1) should not apply. He contended that he attempted only to detonate a small bomb, which turned out to be non-functional, in an empty parking lot near businesses that were closed at the time. He therefore claimed he did not knowingly create a substantial risk of death or serious injury to any person. Instead,

---

[1] The government also made a notation on Mr. Ansberry's written plea statement indicating that it agreed with his version of the offense's elements.

in Mr. Ansberry's view, the highest base offense level that could apply under § 2K1.4(a) was level twenty because his offense might be said to have endangered a place of public use; he further argued that an even lower base offense level of sixteen could be appropriate under § 2K1.4(a)(4) because a parking lot is not a place of public use, as that term is used in the guideline. *See* U.S.S.G. § 2K1.4(a)(2)(C), (4).

Second, the government sought a three-level official-victim enhancement, under U.S.S.G. § 3A1.2(a), because Nederland police, and particularly Officer O'Naullain, were victims of Mr. Ansberry's crime who were targeted based on their status as police officers. *See* U.S.S.G. § 3A1.2(a). Mr. Ansberry argued that § 3A1.2(a) does not apply because it requires an individual, not an organizational, victim; because he specifically pleaded guilty to attempting to use a destructive device against property, not against any person; and because there is no evidence that he intended to victimize any individual.

Third, the government sought a terrorism enhancement under U.S.S.G. § 3A1.4, which would have the effect of increasing Mr. Ansberry's offense level by twelve and converting his criminal history category from I to VI. *See* U.S.S.G. § 3A1.4. The government argued the terrorism enhancement applied because Mr. Ansberry's offense was calculated to influence or affect government conduct and to retaliate against government conduct, namely the 1971 killing of Guy Goughnor by Marshal Forbes. *See id.*; *see also* 18 U.S.C. § 2332b(g)(5). Mr. Ansberry argued the terrorism enhancement was not applicable because he did not intend to retaliate against the police but instead acted only to remind the public about the plight of his

9

friend, because his actions did not meet the definition of retaliation, and because his conduct does not fit the kind of terrorist activities that the enhancement was designed to punish. Mr. Ansberry also argued against a § 3A1.4 enhancement on the ground that judicial factfinding should not be employed to increase a sentence to a term that would otherwise be substantively unreasonable.

The parties' arguments on these three guidelines provisions resulted in dramatically different calculations of the applicable guidelines range. Accepting the government's position on all three issues would result in a range of 324 to 405 months' imprisonment, while Mr. Ansberry argued for a range of 24 to 30 months' imprisonment based on a base offense level of twenty, with no enhancements.

The district court agreed with the government on all three guidelines issues. The court determined that the base offense level was twenty-four pursuant to § 2K1.4(a)(1)(A) because Mr. Ansberry knowingly created a substantial risk of death or serious injury to at least Officer O'Naullain. The court determined that the § 3A1.2(a) official-victim enhancement applied because Mr. Ansberry specifically targeted individual employees of the Nederland police department in retaliation for Marshal Forbes's killing of Mr. Ansberry's friend, Mr. Goughnor. The court also determined that the § 3A1.4 terrorism enhancement applied because Mr. Ansberry intentionally targeted the Nederland police station and because his offense was in retaliation for his friend's killing by the town's marshal. Thus, the court assigned Mr. Ansberry a total offense level of thirty-six and a criminal history category of VI, resulting in a guidelines range of 324 to 405 months in prison. After considering

10

Mr. Ansberry's arguments regarding the 18 U.S.C. § 3553 factors, the court imposed a sentence of 324 months' imprisonment.

## II.    DISCUSSION

On appeal, Mr. Ansberry challenges the district court's application of each of the three sentencing guidelines provisions the parties disputed at sentencing. "We review the district court's application of the Sentencing Guidelines for abuse of discretion." *United States v. Rodriguez*, 945 F.3d 1245, 1248 (10th Cir. 2019). "In applying that standard, we review questions of law de novo and factual findings for clear error, 'giving due deference to the district court's application of the Guidelines to the facts.'" *Id.* at 1249 (quoting *United States v. Pentrack*, 428 F.3d 986, 989 (10th Cir. 2005)). "'Determination of whether facts satisfy a prescribed standard is a mixed question of fact and law.'" *United States v. Patton*, 927 F.3d 1087, 1101 (10th Cir. 2019) (alterations omitted) (quoting *Campbell v. Bartlett*, 975 F.2d 1569, 1574 (10th Cir. 1992)). "'We review mixed questions under the clearly erroneous or de novo standard, depending on whether the mixed question involves primarily a factual inquiry or the consideration of legal principles.'" *Id.* (quoting *United States v. Kinslow*, 105 F.3d 555, 557 (10th Cir. 1997)).

### A.    *Section 2K1.4(a)(1)(A) Base Offense Level*

Mr. Ansberry first argues that the district court abused its discretion by setting his base offense level at twenty-four under § 2K1.4(a)(1)(A). Under that guideline, a sentencing court is to set the base offense level at twenty-four if the offense "created a substantial risk of death or serious bodily injury to any person other than a

11

participant in the offense, and that risk was created knowingly." U.S.S.G.

§ 2K1.4(a)(1)(A). Mr. Ansberry advances a twofold argument on appeal. He contends

the court wrongly interpreted § 2K1.4(a)(1)(A) to require only that he *intended* to

create that risk when § 2K1.4(a)(1)(A) requires that he actually created a risk. And,

according to Mr. Ansberry, even if the court had found he actually created a risk, no

evidence supports that finding because his bomb was incapable of detonating or

causing death or serious injury.

## 1. The district court found Mr. Ansberry actually created a risk.

Mr. Ansberry argues that application of § 2K1.4(a)(1)(A) requires a sentencing

court to find the defendant actually created a risk of serious bodily injury or death,

not merely that he intended to create such a risk. Here, Mr. Ansberry asserts the

district court found only that he intended to create such a risk, without finding he

actually created that risk.[2] *See United States v. Young*, 893 F.3d 777, 780 (10th Cir.

---

[2] Mr. Ansberry did not raise this argument in the district court. When the court addressed the issue of intent at the sentencing hearing, Mr. Ansberry did not argue that the court could not rely on evidence of his intent (whether solely or in combination with other evidence) and did not otherwise object on this basis. In fact, when the court invited argument, defense counsel claimed § 2K1.4(a)(1)(A) should not apply in part because Mr. Ansberry had *intentionally* designed, crafted, and placed the bomb to avoid injuring anyone. Normally, under these circumstances, we might consider whether the argument has been adequately preserved. *See* Fed. R. Crim. P. 51(b); *United States v. Martinez-Barragan*, 545 F.3d 894, 899 (10th Cir. 2008). However, under the unforeseeable-error doctrine, "we have held that a defendant is not required to object when the sentencing court commits an error that the defendant cannot be expected to anticipate." *Martinez-Barragan*, 545 F.3d at 899. Here, it appears the issue of intent was first raised by the district court at the sentencing hearing and, arguably, defense counsel lacked an opportunity to prepare to address it. To the extent the unforeseeable-error doctrine remains good law, *see id.* at 899 n.1, it might except Mr. Ansberry's argument from the normal rules of waiver.

2018) (explaining that U.S.S.G § 3C1.2 enhancement for recklessly creating a substantial risk of death or serious bodily injury while fleeing from law enforcement "applies only when a defendant *actually* creates a substantial risk" (emphasis added)). While we agree the guideline requires an actual risk, we reject Mr. Ansberry's claim that the court did not find he actually created a substantial risk because it is not borne out by the record.[3]

Before the parties presented their arguments at the sentencing hearing, the court provided a preliminary explanation of its understanding of the evidence and relevant law, focusing primarily on whether Mr. Ansberry's bomb was capable of detonating and whether, if detonated, it was likely to cause injury. Addressing the base offense level specifically, the court explained the mere fact that, due to fortuity, the bomb did not detonate or cause injury was not dispositive regarding whether the bomb created a substantial risk. In support of its view regarding fortuity, the court cited *United States v. Honeycutt*, 8 F.3d 785 (11th Cir. 1993), for the proposition that Mr. Ansberry's "state of mind . . . at the time he placed the device" was "at issue" rather than "the actual results of his actions." R. vol. VIII at 381; *see also id.* at 393.

---

But because neither party addresses waiver and because Mr. Ansberry's argument is otherwise meritless, we ultimately decline to resolve the issue of waiver. *See id.* at 899; *see also United States v. Ramirez*, 528 F. App'x 915, 917 n.1 (10th Cir. 2013).

[3] To be sure, the district court's focus on Mr. Ansberry's state of mind is concerning in light of *Young*'s clear instruction that the relevant inquiry is whether there was an actual risk. *See United States v. Young*, 893 F.3d 777, 780 (10th Cir. 2018). But viewing the record in its entirety, we are convinced the district court ultimately made the necessary finding of actual risk.

Following its preliminary explanation, the district court invited argument from, and engaged in a lengthy colloquy with, defense counsel. The discussion largely concentrated on the issue of fortuity, *i.e.*, whether the bomb's failure to detonate or cause injury was due to fortuity or to something else, such as its design, construction, or location. Defense counsel argued not only that the bomb was incapable of detonating but also that Mr. Ansberry had intentionally designed, built, and placed the bomb in an effort to avoid injuring anyone. The court, however, questioned how this argument squared with Mr. Ansberry's calling and texting of the cell phone, which the court saw as indicating an intent to detonate the bomb in an area where it could have caused injury.

After hearing from counsel, the district court announced its decision. The court found that Mr. Ansberry purposefully created a bomb with HMTD, knowing of its "explosive potential power" and "instability" and thus the "potential risk" of an HMTD bomb. *Id.* at 396–97. Because Mr. Ansberry left the bomb in a public location, knowing that anyone might come into contact with it, the court expressly found that Mr. Ansberry knowingly "plac[ed] those individuals [who came into contact with it] at a substantial risk of death or serious bodily injury." *Id.* at 397. Specifically, the court found that Officer O'Naullain, who "unknowingly picked up" the bomb, "was at risk of death or serious bodily injury when he did this." *Id.* at 397–98. Accordingly, the court applied a base offense level of twenty-four pursuant to § 2K1.4(a)(1)(A).

14

As we read the record, the district court expressly found that Mr. Ansberry actually created the requisite risk, not merely that he intended to do so. Indeed, there can hardly be a clearer finding on this point than the court's determinations that Mr. Ansberry's offense "plac[ed] . . . individuals at a substantial risk of death or serious bodily injury" and that, because of the offense, Officer O'Naullain "was at risk of death or serious bodily injury." R. vol. VIII at 397–98. Mr. Ansberry's assertion that the district court failed to find that he actually created the risk simply misreads the record.

Mr. Ansberry's attempt to bypass the district court's express finding that he actually created a substantial risk by pointing to the court's references to his intent is also unavailing. The court's references to intent occurred almost entirely in its preliminary statement and in the extended colloquy with defense counsel. When announcing its decision, however, the court focused on the bomb's potential for detonating and causing injury and on Mr. Ansberry's knowledge of that potential. The court's explanation for its substantial-risk finding included only a single, oblique reference to Mr. Ansberry's intent. *See id.* at 398 ("Mr. Ansberry left that bomb out there for anybody to come into contact with, and it was come into contact with by the police department, and a police officer, which was his intent.").Contrary to Mr. Ansberry's characterization, the record fairly supports the conclusion that the court found Mr. Ansberry actually created the requisite risk. And the court's attenuated comments regarding intent are insufficient for Mr. Ansberry to meet his burden of demonstrating error based on the record. *See United States v. Pulham*, 735 F. App'x

15

937, 945–46 (10th Cir. 2018) (where the "record fairly supports the conclusion" that a sentencing court engaged in permissible factfinding, the court's "isolated comments . . . arguably suggest[ing]" it engaged in impermissible factfinding is not enough for a defendant to meet his burden to show a sentencing error on appeal).[4]

**2. The district court did not clearly err in finding that Mr. Ansberry created a substantial risk.**

Mr. Ansberry next argues that, even if the district court found he actually created a substantial risk, the court erred in making this finding. First, he argues the court failed expressly to make certain predicate findings necessary to establish that he actually created a substantial risk. He points out, for instance, that the court never expressly found that the bomb was capable of detonating or that, if detonated, it was capable of seriously injuring or killing anyone. In Mr. Ansberry's view, such express findings are required to support the court's ultimate finding that his offense created a substantial risk for purposes of § 2K1.4(a)(1)(A).

This argument misapprehends the nature of our review. Correct application of § 2K1.4(a)(1)(A) requires a sentencing court to find that the offense "created a substantial risk of death or serious bodily injury." U.S.S.G. § 2K1.4(a)(1)(A). It is this finding we review for clear error based on the evidence in the record. *See United States v. Dillon*, 351 F.3d 1315, 1318 (10th Cir. 2003) ("[U.S.S.G. § 2Q1.2(b)(2)] requires the district court to make the finding that the offense resulted in a substantial

---

[4] Because the issue is not fairly raised in this appeal, we decline to address what part, if any, a defendant's intent might have in making a substantial-risk determination under § 2K1.4(a)(1)(A).

16

likelihood of death or serious bodily injury, and we review this finding for clear error based on the facts in the record."); *see also United States v. Simpson*, 845 F.3d 1039, 1063 (10th Cir. 2017) (reviewing for clear error a factual determination that the defendant recklessly created a substantial risk of death or serious bodily injury for purposes of U.S.S.G. § 3C1.2 enhancement). Necessary predicate findings like those suggested by Mr. Ansberry are implicitly subsumed within the ultimate substantial-risk finding. *See Dillon*, 351 F.3d at 1318 (rejecting argument that court erred by applying § 2Q1.2(b)(2) enhancement for offense that resulted in substantial likelihood of death or serious bodily injury without making "a separate finding that a fire was substantially likely to occur" because "[t]he risk of fire is necessarily subsumed within [the substantial-likelihood] finding"); *cf. United States v. Begaye*, 635 F.3d 456, 466 (10th Cir. 2011) (explaining that a U.S.S.G. § 5K2.3 departure based on a finding that the offense caused extreme psychological injury "subsumed the predicate finding" that the injury exceeded "the 'normal' injury" resulting from such an offense). Thus, for purposes of this appeal, we do not require an express finding that the bomb was capable of detonating and causing injury. Instead, we inquire whether record evidence—including evidence that the bomb was capable of detonating and causing injury—supports the court's finding that Mr. Ansberry's offense created a substantial risk of serious injury or death.

Second, Mr. Ansberry challenges the district court's substantial-risk finding by arguing the record is devoid of evidence that the bomb was capable of detonating or causing death or serious injury. He explains that, although he attempted to trigger the

17

bomb by calling and texting the cell phone, the bomb could not have detonated because he used an intact, rather than broken, light bulb, preventing the HMTD from becoming heated enough to detonate. He also asserts there is no evidence the HMTD was of sufficient quantity or quality to explode on its own from friction, heat, or impact or, if it did, to cause serious injury or death. Because, in his view, there was no evidence to support a finding that the bomb could detonate, Mr. Ansberry asserts the court erred in finding that his offense created a substantial risk of death or serious injury.

As explained, we review for clear error the district court's finding that Mr. Ansberry's offense created a substantial risk. *See United States v. Curtis*, 799 F. App'x 639, 642 (10th Cir. 2020) ("The determination whether an [offense] created a substantial risk of serious bodily injury [or death] 'is so fact-focused that we review for clear error.'" (quoting *Patton*, 927 F.3d at 1101)). "Factual findings are clearly erroneous only if they are without factual support in the record or if this court, considering all the evidence, is left with a definite and firm conviction that a mistake has been made." *United States v. Cortes-Gomez*, 926 F.3d 699, 708 (10th Cir. 2019).

Once again, we disagree with Mr. Ansberry's assessment of the record. The record contains evidence—mainly in the form of expert testimony—that the bomb was capable of detonating. One government expert, although conceding on cross-examination that he could not say whether an intact light bulb would generate enough heat to detonate the HMTD, maintained that the bomb was nevertheless capable of detonating. Another government expert explained that, although "every instance [of

18

introducing energy to HMTD] might not cause it to detonate, you're playing with a high-risk situation at that point. It is capable of detonating, but you might be lucky[,] and it might not." R. vol. VIII at 166. Similarly, Mr. Ansberry's own expert testified that, although the bomb was incapable of detonating via the phone calls and texts as designed, the HMTD, even degraded to the extent it was, was capable of detonating. He explained that, although the bomb could not function as designed, "that doesn't mean that you couldn't have taken it and banged it against a wall and have it explode and kill yourself." *Id.* at 357. There is also record evidence that the bomb, if it had detonated, could have caused serious injury or death. Both government and defense experts testified that, if it had exploded, the bomb could have killed or seriously injured people near it. Further, when the bomb was eventually detonated, it tore the sandbags surrounding it to shreds.

On this record, we cannot say the district court clearly erred in making its substantial-risk finding. Contrary to Mr. Ansberry's argument, the record contains factual support for an implicit finding that the bomb was capable of detonating and causing serious injury or death.[5] Thus, there is factual support for the court's express

---

[5] Mr. Ansberry relies heavily on *United States v. Smith*, 210 F.3d 760 (7th Cir. 2000). The defendant in *Smith* poured an unknown amount of anhydrous ammonia from his car as he fled police, and the district court applied an enhancement for recklessly creating a substantial risk of death or serious injury under U.S.S.G. § 3C1.2. *Smith*, 210 F.3d at 761. The Seventh Circuit reversed, explaining that the record did not indicate "what amount [the defendant] dumped, what concentration of vapors the officers were exposed to, and for what length of time that exposure lasted," making it impossible to know "if [he] poured the equivalent of a[n essentially harmless] lighted match out the window, or if he poured out an amount that would expose passengers in another car following closely behind to a *substantial* risk." *Id.*

finding that Mr. Ansberry's offense created the risk required for application of § 2K1.4(a)(1)(A), and we are not left with a definite and firm conviction that this finding was mistaken. *See Cortes-Gomez*, 926 F.3d at 708.

*    *    *

In sum, we conclude that the district court found Mr. Ansberry actually created a substantial risk of death or serious bodily injury and that this finding was not clearly erroneous.

### B.    Section 3A1.2(a) Official-Victim Enhancement

Mr. Ansberry next challenges the district court's application of the § 3A1.2(a) official-victim enhancement. Under § 3A1.2(a), a sentencing court is to apply a three-level enhancement "if (1) the victim was . . . a government officer or employee . . . and (2) the offense of conviction was motivated by such status." U.S.S.G. § 3A1.2(a).

Relying on *United States v. Blackwell*, 323 F.3d 1256 (10th Cir. 2003), Mr. Ansberry argues the district court erred by basing the § 3A1.2(a) official-victim enhancement on conduct related to the offense rather than on only the facts immediately related to his offense of conviction.[6] In *Blackwell*, the defendant, using a

---

at 763. But, unlike in *Smith*, the district court here had the benefit of expert testimony that Mr. Ansberry's bomb could have detonated and caused serious injury or death.

[6] The dissent would hold that Mr. Ansberry waived this issue by not making the argument in the district court he now advances in reliance on *United States v. Blackwell*, 323 F.3d 1256 (10th Cir. 2003). To be sure, the dissent identifies differences between Mr. Ansberry's arguments here and in the district court that could support our refusal to consider the issue on appeal. But the government never

laser sight, pointed a firearm at police officers and was convicted of possessing a firearm as a previously convicted felon in violation of 18 U.S.C. § 922(g)(1). *See Blackwell*, 323 F.3d at 1257–58. The district court applied a § 3A1.2(a) official-victim enhancement, and this court reversed. *Id.* at 1258–62. We explained that, because § 3A1.2(a) specifically refers to the "offense of conviction," rather than the offense in general, it "applies only to the offense of conviction, not to that offense accompanied by relevant conduct." 323 F.3d at 1260; *see id.* ("[T]he guidelines 'indicate that the phrase "offense of conviction" encompasses only facts immediately related to the specific offense for which the defendant was convicted.'" (brackets omitted) (quoting *United States v. Holbert*, 285 F.3d 1257, 1261 n.3 (10th Cir. 2002))). Because "[t]he offense of conviction in [*Blackwell*] was possession of a firearm by a felon[, n]othing about the status of the officers in any way motivated the commission of that offense, nor were the officers victims of that offense." *Id.* at 1262. According to Mr. Ansberry, *Blackwell* requires the reversal of the official-victim enhancement here.

Mr. Ansberry claims his "offense of conviction consists of . . . the facts establishing that [he] . . . committed the elements of the crime." Appellant's Reply

asserts that Mr. Ansberry waived the argument. Accordingly, the government has waived the waiver and we exercise our discretion to consider the argument on the merits. *See United States v. De Vaughn*, 694 F.3d 1141, 1158 (10th Cir. 2012) (holding that government waived the preclusive effect of defendant's guilty plea by not arguing waiver in its opening brief on appeal); *United States v. Heckenliable*, 446 F.3d 1048, 1049 n.3 (10th Cir. 2006) ("The Government, however, does not argue Defendant waived his present challenge, and accordingly, has waived the waiver."); *United States v. Reider*, 103 F.3d 99, 103 n.1 (10th Cir. 1996) (same).

Br. at 11–12. And he further contends that "[t]he only facts immediately related to [his] offense of conviction are those he admitted at his plea hearing." *Id.* at 12. Specifically, those facts are that he used or attempted to use "a destructive device against *property* in the United States," Appellant's Opening Br. at 9, when "he attempted to detonate a destructive device in a deserted shopping center between 4:55 a.m. and 5:15 a.m. on October 11, 2016," *id.* at 32 (quotation marks and brackets omitted) (quoting R. vol. IX at 87–88); *see also* Appellant's Reply Br. at 12; R. vol. I at 125. In Mr. Ansberry's view, any events that occurred after his attempts to detonate the bomb are not facts immediately related to his offense of conviction and thus are irrelevant for purposes of § 3A1.2(a). He argues that neither Officer O'Naullain nor any other government employee counts as a victim because none of them were anywhere near the bomb between 4:55 a.m. and 5:15 a.m. and because Mr. Ansberry's subsequent conduct in leaving the bomb to later be discovered by Officer O'Naullain constitutes relevant conduct, not a fact immediately related to the offense of conviction.

The government does not contest that, in applying a § 3A1.2(a) enhancement, a sentencing court is limited to considering only the offense of conviction. Instead, the government argues that Mr. Ansberry's understanding of "offense of conviction," which looks only to the facts he admitted when pleading guilty, is an "overly cramped" definition. Appellee's Br. at 42. In the government's view, the "offense of conviction" encompasses the offense a defendant pleaded guilty to and was convicted of, *i.e.*, the offense specified in the indictment, which here was the "use and attempt[ed] . . . use [of]

22

a . . . destructive device . . . against a person *and* property within the United States" "[o]n or about October 11, 2016." R. vol. I at 38 (emphasis added).

Contrary to the government's approach, *Blackwell* directs us to look to facts immediately related to the offense of conviction and says nothing about looking to the facts alleged in the indictment. Instead, *Blackwell* suggests beginning with an examination of the statutory definition of the offense. Here, the statute defines the offense Mr. Ansberry was convicted of as "us[ing] . . . or attempt[ing] . . . to use[] a weapon of mass destruction . . . against any person *or* property within the United States." 18 U.S.C. § 2332a(a)(2) (emphasis added). Thus, the offense of conviction can be committed either by using the weapon of mass destruction against a person or against property. Mr. Ansberry contends that from his statements at the plea hearing as well as his written plea statement, it is apparent he pleaded guilty only to attempting to use a weapon of mass destruction against property. As a factual basis for his plea, Mr. Ansberry admitted, in relevant part:

> Between 4:56 a.m. and 5:14 a.m. on October 11, 2016, [Mr.] Ansberry made several calls on a cellular phone in an attempt to detonate a small destructive device that was in a backpack outside of the police station in Nederland, Colorado. The device failed to detonate. . . .
>
> . . . .
>
> . . . [T]he destructive device was not intended to cause casualties or mass destruction.

R. vol. I at 125–26.

In response, the government provided a statement of facts that included events following the bomb's failure to detonate and Officer O'Naullain's subsequent

23

discovery and handling of the device. The government's version included facts to support attempted use of the device against a person within the United States.

At the plea hearing, Mr. Ansberry noted the differences between his and the government's factual statements and explained he was admitting to only the facts set out in his own statement. Specifically, Mr. Ansberry explained he was pleading guilty to "attempting to detonate a destructive device in a deserted shopping center between 4:55 a.m. and 5:15 a.m.[,] . . . which was not capable of causing mass destruction, mass casualties." R. vol. IX at 87–88. When asked to state the elements of the offense, the prosecutor employed Mr. Ansberry's version, stating that the government would have to prove Mr. Ansberry attempted to use a destructive device "against *property* within the United States." *Id.* at 93 (emphasis added). Mr. Ansberry then pleaded guilty, and, based on his factual statement, the district court accepted Mr. Ansberry's plea and adjudged him guilty.

Under these circumstances, we are convinced that the facts immediately related to Mr. Ansberry's offense of conviction are that he attempted to use a destructive device against *property* between roughly 4:55 am and 5:15 am on October 11, 2016. While there may have been some confusion created by the indictment's use of the conjunctive "and" in contrast to the statute's use of the disjunctive "or," there is no doubt Mr. Ansberry pleaded guilty to violating § 2332a(a)(2) based only on his attempt to use the device against property during that specific timeframe.

At sentencing, Mr. Ansberry, citing *Blackwell*, objected to application of the official-victim enhancement on the ground that he had pleaded guilty only to

24

attempting to use a destructive device against property. In response, the government argued, as it does in this appeal, that Mr. Ansberry pleaded guilty to the facts alleged in the indictment and could not "narrow the elements" of the offense set out in that charging document. R. vol. VIII at 402. The government contended that Officer O'Naullain counted as an official victim because he was placed at substantial risk when he unwittingly picked up the bomb and that two other officers in the Nederland police station became official victims when Officer O'Naullain brought the bomb into the station.

The district court overruled Mr. Ansberry's objections and applied the enhancement. The court found *Blackwell* distinguishable apparently on the ground that, to a large extent, its application is limited to victimless offenses. The court then explained that, by placing his bomb outside the police station, Mr. Ansberry "intended to commit [his] offense against [both] the police department and its members." *Id.* at 404; *see id.* at 405 ("By placing the [bomb] in the immediate vicinity of the Nederland Police Department, [Mr. Ansberry] specifically targeted the employees of the Nederland Police Department."). In clarifying how the bomb's location demonstrated that police officers were Mr. Ansberry's "intended victims," the court pointed out only that it was left where "a police officer could pick it up." *Id.* at 404.

Much of the district court's reasoning seems to equate committing an offense against government property with targeting and victimizing government employees. We do not doubt that in some circumstances a § 3A1.2(a) official-victim enhancement can apply when the offense of conviction is an offense against government property. But,

25

under *Blackwell*, the enhancement does not apply (to an offense against property or to any other offense) unless the facts immediately related to the offense—and not any additional relevant conduct—supports its application. Automatically treating an offense against government property as necessarily victimizing government employees conflicts with *Blackwell*'s clear teaching. That appears to be what the district court did here in large part.

When confronted with an offense against government property, a sentencing court, rather than automatically equating it with the victimization of government employees, should point to the facts immediately related to the offense that demonstrate how the offense victimized government employees. Here, the district court offered only one reason for finding that Mr. Ansberry's offense victimized the officers: He left the bomb where "a police officer could pick it up." *Id.* Thus, it appears the court, in deciding to apply the enhancement relied entirely on evidence that Mr. Ansberry, after failing to detonate the bomb in front of the police station during the twenty-minute period, left it there in an effort to use it against police officers, such as Officer O'Naullain, who arrived hours later. In other words, the court did not limit its analysis to only the facts immediately related to Mr. Ansberry's offense; instead, it considered additional related conduct. Under *Blackwell*, this was error.

We thus reverse the district court's imposition of the official-victim enhancement and remand for resentencing so that the district court can consider, in the first instance, whether the facts immediately related to the offense of conviction support the enhancement.

26

### C. Section 3A1.4 Terrorism Enhancement

Mr. Ansberry next challenges the district court's application of the § 3A1.4 terrorism enhancement. Under § 3A1.4, a sentencing court is to apply the enhancement "[i]f the offense is a felony that involved . . . a federal crime of terrorism," as that term is defined by 18 U.S.C. § 2332b(g)(5).[7] U.S.S.G. § 3A1.4(a); *see id.* cmt. n.1. An offense involves a federal crime of terrorism under § 2332b(g)(5) if it "is calculated to influence or affect the conduct of government by intimidation or coercion, or to retaliate against government conduct" and violates a specific enumerated provision. 18 U.S.C. § 2332b(g)(5). Here, there is no dispute that Mr. Ansberry's offense is a violation of one of the enumerated provisions, so the only issue is whether it was calculated to influence or affect the conduct of government by intimidation or coercion, or to retaliate against government conduct.

---

[7] Section 3A1.4 "makes clear that the predicate offense must either (1) 'involve' a federal crime of terrorism or (2) be 'intended to promote' a federal crime of terrorism." *United States v. Awan*, 607 F.3d 306, 313 (2d Cir. 2010). This appeal concerns only an offense that might be said to involve, not one that intended to promote, a federal crime of terrorism.

The district court found by clear and convincing evidence[8] that Mr. Ansberry's

offense was calculated to retaliate against government conduct.[9] The court

determined, and Mr. Ansberry does not dispute on appeal, that his offense was

intended as an act of retaliation for the 1971 killing of Guy Goughnor by Nederland's

---

[8] Ordinarily, district courts are required to make factual findings at sentencing based on a preponderance of the evidence. *See United States v. Hooks*, 551 F.3d 1205, 1217 (10th Cir. 2009). However, the Supreme Court has left open the possibility that a heightened standard of proof may be appropriate when a sentencing court's factual determinations would dramatically increase the sentence. *See United States v. Watts*, 519 U.S. 148, 156–57 (1997); *Kinder v. United States*, 504 U.S. 946, 948 (1992) (White, J., dissenting from denial of certiorari). We have sometimes said that our cases "have left open the possibility that extraordinary circumstances might justify the use of a more demanding standard at sentencing than a preponderance of the evidence," although "we have never applied such an enhanced standard of proof." *United States v. Redifer*, 631 F. App'x 548, 563 (10th Cir. 2015) (collecting cases). But we have also said that such a possibility is foreclosed in this circuit, and that only the preponderance standard is employed. *See United States v. Robinson*, 946 F.3d 1168, 1171–72 (10th Cir. 2020) (collecting cases). Here, Mr. Ansberry asked the district court to apply a clear-and-convincing standard to its factual determinations involving the § 3A1.4 terrorism enhancement, and the court determined that it would do so. Because Mr. Ansberry's arguments on appeal regarding the terrorism enhancement implicate only conclusions of law, we do not address the standard the district court is to apply when resolving factual disputes concerning application of the enhancement.

[9] As the text of § 2332b(6)(5)(A) makes clear, an offense may qualify as a federal crime of terrorism if it was "calculated" to either (1) "influence or affect the conduct of government by intimidation or coercion" or (2) "retaliate against government conduct." 18 U.S.C. § 2332b(g)(5)(A). Here, although the district court stated in passing that it "infer[red] . . . that [D]efendant had the specific intent to influence or affect the conduct of [government] or to retaliate against its conduct," R. vol. IX at 23, it is clear from the record that the court imposed the § 3A1.4 terrorism enhancement based only on the "retaliate" prong, and not on the "influence or affect" prong, of § 2332b(g)(5)(A). We decline the government's invitation to determine in the first instance whether Mr. Ansberry's offense was calculated to influence or affect government conduct through intimidation or coercion, leaving that issue instead for the district court on remand.

marshal, Renner Forbes. As Mr. Ansberry points out, however, the district court expressly refused to determine whether Marshal Forbes's actions objectively constituted government conduct. The court instead appears to have concluded that it could apply the § 3A1.4 terrorism enhancement without making that determination because, regardless of whether Marshal Forbes's actions objectively constituted government conduct, Mr. Ansberry deemed those actions to be government conduct, and thus his offense was calculated to retaliate against what he subjectively believed was government conduct.

Mr. Ansberry argues that the district court erred because, by the terms of § 2332b(g)(5)(A), the § 3A1.4 terrorism enhancement can be applied only if the conduct against which a defendant retaliates is objectively government conduct. This issue appears to be one of first impression in this court. But before addressing it, we must first be satisfied that Mr. Ansberry preserved his argument by raising it in the district court.

**1. Mr. Ansberry preserved the argument by raising it in the district court.**

"To preserve [an] issue in [the] district court, [a party] need[s] only to alert the court to the issue and seek a ruling." *Harris v. Sharp*, 941 F.3d 962, 979 (10th Cir. 2019); *see also United States v. Cohee*, 716 F. App'x 752, 755 (10th Cir. 2017) (applying rule in criminal appeal). Specifically, "[i]n federal criminal cases, [Fed. R. Crim. P.] 51(b) tells parties how to preserve claims of error: 'by informing the court—when the court ruling or order is made or sought—of the action the party wishes the court to take, or the party's objection to the court's action and the grounds

29

for that objection.'" *United States v. Puckett*, 556 U.S. 129, 135 (2009) (quoting Fed. R. Crim. P. 51(b)). But, "[a] party does not preserve an issue merely . . . by presenting the issue to the district court in a vague and ambiguous manner . . . [or] by making a fleeting contention before the district court." *U.S. Aviation Underwriters, Inc. v. Pilatus Bus. Aircraft, Ltd.*, 582 F.3d 1131, 1142 (10th Cir. 2009) (quotation marks omitted). "We also do not address arguments raised in the [d]istrict [c]ourt in a perfunctory and underdeveloped manner." *In re Rumsey Land Co.*, 944 F.3d 1259, 1271 (10th Cir. 2019) (quotation marks omitted); *see also United States v. Gantt*, 679 F.3d 1240, 1248 (10th Cir. 2012) ("An unelaborated snippet cannot preserve an issue for appeal.").

The government argues Mr. Ansberry failed to preserve his argument. The government correctly points out that, at sentencing, Mr. Ansberry's arguments regarding application of the §3A1.4 terrorism enhancement focused to a large extent on whether the evidence showed his offense was motivated by a desire to retaliate (rather than to remind the public about the plight of his friend and other young men killed by police) and whether his offense met the definition of "retaliation," not on whether the retaliation was against actual government conduct. The government concedes that Mr. Ansberry did at times address whether Marshal Forbes's actions constituted government conduct but asserts that his arguments were underdeveloped and ambiguous. For instance, the government acknowledges that, prior to sentencing, Mr. Ansberry argued in one of his sentencing statements that "murder by a person who happens to be a police officer is not government conduct," R. vol. I at 156–57,

but the government points out that the argument consisted of a single sentence and that, in a subsequent sentencing statement, Mr. Ansberry argued that the murder was committed "by an on-duty police officer acting in his official capacity," R. vol. IV at 33.

Mr. Ansberry, however, contends that the government fails to account for other instances in which he raised the argument during sentencing. At the sentencing hearing, for instance, defense counsel attempted to elicit testimony from the lead investigator on the case regarding Marshal Forbes's actions during the 1971 killing of Mr. Goughnor. When the district court interjected to inquire about the relevance of that line of questioning, counsel explained that he was attempting to "establish . . . that there was not some government action that . . . Mr. Ansberry[] inten[ded] to influence or take," "that any . . . interest that Mr. Ansberry had in the murder of his friend[] was wholly nongovernmental," and that his questions were "relevant to the nongovernmental nature of what happened here." R. vol. VIII at 274, 276. After testimony had ended, defense counsel argued, in a brief exchange with the court, that "what happened 45 years ago was a civilian [action]" and that "Renner Forbes . . . was acting in the capacity of a civilian when he took [the life of] a 19-year-old innocent man." *Id.* at 416. When the court recessed the hearing for the parties to provide supplemental briefing, Mr. Ansberry, in his brief, argued that the government had failed to prove his offense was calculated to retaliate against government conduct because:

31

> to do so would mean proving that the murder of Guy Goughn[o]r by Renner Forbes was government conduct. Proving terrorism under § 2332b(g)(5) requires proof that it was government conduct being retaliated for. The government however concedes that the murder of Guy Goughnor was not government conduct.

R. vol. I at 343.[10]

Based on our review of the record—and specifically those parts of the record cited by Mr. Ansberry—we conclude that he preserved the issue for appeal. He specifically objected to application of the § 3A1.4 terrorism enhancement and, in the portion of his sentencing statement addressing the guideline, asked for a ruling from the district court rejecting its application on the ground, among others, that Marshal Forbes's actions did not constitute government conduct for purposes of § 2332b(g)(5)(A). Although his explanation of the issue in his initial sentencing statement might have benefited from being more fulsome, Mr. Ansberry's argument was not fleeting, as he raised it throughout the sentencing process. Moreover, Mr. Ansberry's presentation of the argument was not vague or ambiguous. Although his sentencing statements might have been somewhat inconsistent, he argued during the remainder of the proceedings that Marshal Forbes's actions did not constitute government conduct. Nor did Mr. Ansberry raise the argument in a perfunctory or

---

[10] When the hearing resumed, and after the district court had overruled his objections to the § 3A1.4 terrorism enhancement, defense counsel stated he was struck by the court's apparent finding "that the murder of Guy Goughnor by Renner Forbes was a governmental act." R. vol. IX at 50. When the court responded that it had not found that "it was a governmental act," counsel then expressed his understanding that the court had found instead that "the murder of Guy Goughnor by Renner Forbes was not a governmental act." *Id.* at 50–51. The court then clarified that it was "making no finding on that." *Id.* at 51.

32

underdeveloped manner. Though his treatment of the issue in his sentencing statements (and perhaps at the sentencing hearing) arguably was not sufficiently developed, his presentation of the issue in his supplemental briefing clearly was. Accordingly, we agree with Mr. Ansberry that he preserved the issue for our review.

## 2. The district court erred by applying the § 3A1.4 terrorism enhancement.

Turning to the merits, Mr. Ansberry's argument involves the interpretation of the guidelines as well as a criminal statute, so our review is de novo. *See United States v. Sweargin*, 935 F.3d 1116, 1120 (10th Cir. 2019); *United States v. Doby*, 928 F.3d 1199, 1202 (10th Cir. 2019). "Any exercise in statutory interpretation must begin with an examination of the plain language at issue." *United States v. Duong*, 848 F.3d 928, 931 (10th Cir. 2017) (quotation marks omitted). "The plainness of statutory language is determined by reference to the language itself, the specific context in which that language is used, and the broader context of the statute as a whole." *United States v. Burkholder*, 816 F.3d 607, 614 (10th Cir. 2016) (quotation marks omitted). "If the terms of the statute are clear and unambiguous, the inquiry ends[,] and we simply give effect to the plain language of the statute." *United States v. Sprenger*, 625 F.3d 1305, 1307 (10th Cir. 2010) (quotation marks omitted).

Mr. Ansberry argues the statute's reference to "retaliat[ion] against *government conduct*," 18 U.S.C. § 2332b(g)(5)(A) (emphasis added), means the statute (and hence the guideline) does not apply to retaliation against non-government conduct. Reading this phrase in isolation, we would readily agree with Mr. Ansberry that it clearly and unambiguously reaches offenses targeting actual

33

government conduct but does not reach those targeting conduct that is objectively non-governmental. *See United States v. Sanders*, 796 F.3d 1241, 1250 (10th Cir. 2015) (applying the doctrine of *expressio unius est exclusio alterius* in concluding that, because code provision expressly "authorizes the impoundment of vehicles from *public* property," it "does not authorize, and moreover proscribes, the impoundment of vehicles from private lots").

The government points out, however, that the statute does not straightforwardly define "federal crime of terrorism" as an offense retaliating against government conduct but, instead, as an offense "*calculated* . . . to retaliate against government conduct." 18 U.S.C. § 2332b(g)(5)(A) (emphasis added). The issue then is what effect the statute's reference to "calculat[ion]" has on the meaning of "government conduct." *Id.* Does it mean, as the government contends, that "[a]s long as [Mr.] Ansberry *believed* [the conduct at issue] was government conduct," "it does not matter whether [it] was [in fact] government conduct"? Appellee's Br. at 50. We conclude that it does not.

As used in the statute, "'[c]alculation' is concerned with the object that the [defendant] seeks to achieve through planning or contrivance." *United States v. Awan*, 607 F.3d 306, 317 (2d Cir. 2010) (citing *Calculation*, *Webster's Third New International Dictionary Unabridged* (1986)); *see also id.* ("[C]alculated [means] planned—for whatever reason or motive—to achieve the stated object"); *United States v. Stewart*, 590 F.3d 93, 137 (2d Cir. 2009) ("The conventional meaning of 'calculated' is 'devised with forethought.'" (quoting *Calculated*, *Oxford English*

34

*Dictionary* (2d ed. 1999))). Thus, many of our sister circuits have viewed

§ 2332b(g)(5)(A)'s reference to calculation as imposing something akin to a specific-

intent requirement. *See United States v. Wright*, 747 F.3d 399, 408 (6th Cir. 2014)

(collecting cases); *United States v. Siddiqui*, 699 F.3d 690, 709 (2d Cir. 2012)

(same). In turn, many of their decisions have framed the issue in what might seem to

be straightforward terms: "'[I]f a defendant's *purpose* in committing an offense is . . .

to retaliate against government conduct,' application of the terrorism enhancement is

warranted." *Siddiqui*, 699 F.3d at 709 (quoting *Stewart*, 590 F.3d at 137); *see also*

*Wright*, 747 F.3d at 408 ("A defendant has the requisite intent if he or she acted with

the purpose of influencing or affecting government conduct and planned his or her

actions with this objective in mind.").

The government latches onto the language in these decisions and argues that,

so long as a defendant's subjective purpose or intent was to retaliate against

government conduct, the enhancement applies. Thus, according to the government,

whether the conduct the defendant retaliated against was government conduct,

objectively speaking, is irrelevant.

We do not read the statute or the decisions the government relies on so

broadly. Although we agree that the statute's use of the word "calculated" imposes

something like a specific-intent requirement, that conclusion does not resolve the

issue before us. If § 2332b(g)(5)(A)'s use of "calculated" means that the defendant's

offense must have been committed with specific intent, that just begs the question:

the specific intent to do what? The answer here, of course, is a specific intent to

35

retaliate against government conduct. But that brings us back round to square one: Does the statute require that the conduct the defendant had the specific intent to retaliate against objectively be government conduct, or can it be merely conduct that he subjectively believes to be government conduct? Standing alone, the statute's use of "calculated" does not answer this question in the way the government would like. A statutory requirement of specific intent to retaliate could easily be paired with a requirement that the retaliation be directed against specific types of conduct that are subjectively defined, but it could just as easily be paired with a requirement that the retaliation be directed against objectively defined conduct. It is the statutory language that must control this question.

In our view, the ordinary meaning of the language used by this statute demonstrates that it requires the offense to be calculated, *i.e.*, committed with the specific intent, to retaliate against government conduct, objectively defined. We reach this conclusion for two reasons. First, and chiefly, the statute expressly specifies that it is "*government* conduct" that the offense must be calculated to retaliate against. 18 U.S.C. § 2332b(g)(5)(A) (emphasis added). We think the term "government conduct," in conjunction with the rest of the statute, is most naturally read to mean conduct by government in the objective sense rather than to mean any kind of conduct—*even non-government conduct*—that a defendant believes to be conduct by government.[11] *See United States v. Black*, 773 F.3d 1113, 1115 (10th Cir.

---

[11] The term "government," as used in this statute, refers to an objectively recognizable entity. *See, e.g.*, *Government*, *Oxford English Dictionary* (2d ed. 1989)

36

2014) ("When words are not defined within the statute, we construe them 'in accordance with their ordinary or natural meaning.'" (brackets omitted) (quoting *FDIC v. Meyer*, 510 U.S. 471, 476 (1994))). And, as we have explained, the statute's use of "calculated" does not by itself suggest a different result.[12] Second, the statute contains no express language implicating the defendant's perception or belief regarding the governmental nature of the conduct at issue. As Mr. Ansberry points out, other criminal statutes account for a defendant's subjective perceptions that prompt an offense by expressly referring to "the actual or perceived" circumstances at issue. *See, e.g.*, 18 U.S.C. § 249(a)(1)–(2), (c)(4) (criminalizing conduct taken "because of the actual or perceived race, color, religion, or national origin" or "because of the actual or perceived . . . gender, sexual orientation, gender identity, or disability of any person"). The absence of similar language in § 2332b(g)(5)(A) serves to confirm that "government conduct" should be understood in an objective,

---

(defining "government" to mean, as relevant here, "[t]he governing power in a state; the body of persons charged with the duty of governing"). If a term is commonly defined in an objective, rather than subjective, sense, the objective sense is the one most likely conveyed by the term's use in a statute, at least in the absence of an indication otherwise. *See United States v. Donovan*, 242 F.2d 61, 63 (2d Cir. 1957).

[12] The dissent would reach a contrary conclusion also relying on the plain meaning of "calculated." Dis. Op. at 9. To the extent the dissent has identified a contrary reasonable interpretation of the criminal statute, the rule of lenity dictates that we interpret it in favor of Mr. Ansberry. *See United States v. Rentz*, 777 F.3d 1105, 1113 (10th Cir. 2015) (explaining that "[t]o the extent any ambiguity remains" after exhaustion of the evidence of congressional meaning, "the tie goes to the presumptively free citizen and not the prosecutor" under the rule of lenity); *United States v. Wilson*, 10 F.3d 734, 736 (10th Cir. 1993) ("The rule [of lenity] applies to substantive, as well as sentencing, statutes.").

37

not subjective, sense. *See Sessions v. Dimaya*, 138 S. Ct. 1204, 1218 (2018) (cautioning against construing criminal statute that does not include certain language to convey the same meaning as other statutes that expressly include that language).

The cases the government cites do not lead to a different conclusion. Those cases are largely concerned with interpreting "calculated," and they read that term as creating something closely resembling a specific-intent requirement. *See, e.g.*, *Siddiqui*, 699 F.3d at 709. But, as we have already explained, such a requirement does not suggest that § 2332b(g)(5)(A) applies simply because a defendant believed the conduct he retaliated against was government conduct. None of these cases directly address the issue before us, and the handful of cases addressing § 2332b(g)(5)(A) that do interpret the phrase "government conduct" suggest that term has an objective rather than a subjective meaning.

In *United States v. Assi*, 428 F. App'x 570 (6th Cir. 2011), for instance, the defendant asserted that, to the extent it was conducting activities beyond its borders, Israel could not be considered a "government" for purposes of § 2332b(g)(5)(A). 428 F. App'x at 574–75. In rejecting the argument, the court did not give any weight to the defendant's "belie[f] that Israel should not [be] deemed a 'government,'" but instead appears to have concluded that a nation's allegedly "illegal[]" activities have no bearing on whether it objectively constitutes a "government." *Id.* at 575–76. Similarly, in *United States v. Salim*, 549 F.3d 67 (2d Cir. 2008), the defendant contended that "the rulings of a judge do not constitute 'government conduct.'" 549 F.3d at 79. Rather than delve into the defendant's perceptions or beliefs regarding the

38

nature of judicial rulings, the court concluded the argument was "patently meritless" on the ground that judicial rulings objectively constitute government conduct. *Id.* And, in *United States v. Thurston*, Nos. CR 06-60069-01-AA, et al., 2007 WL 1500176 (D. Or. May 21, 2007), the district court agreed with the defendants' argument that, because "the definition of 'federal crime of terrorism' explicitly requires an intent 'to influence or affect the *conduct of government* by intimidation or coercion, or to retaliate against *government conduct*,' "the government must establish that the defendants targeted government conduct rather than the conduct of private individuals or corporations." *Id.* at *15 (quoting 18 U.S.C. § 2332b(g)(5)(A)).

Thus, the extant caselaw does not support the government's position. If anything, it supports our conclusion that the statute's plain language requires that the conduct against which an offense is calculated to retaliate must be conduct by the government, objectively defined.

We hold that, if a sentencing court applies a § 3A1.4 terrorism enhancement on the ground that the defendant's offense was calculated to retaliate against government conduct, the conduct that the defendant retaliates against must objectively be government conduct. Here, despite record evidence and argument that the conduct Mr. Ansberry retaliated against was not objectively government conduct, the district court applied the § 3A1.4 terrorism enhancement on this ground while expressly refusing to find whether the conduct objectively constituted government

39

conduct. This was reversible error. We will therefore remand the case to the district court for resentencing.[13]

*   *   *

In sum, we conclude Mr. Ansberry preserved his challenge to the § 3A1.4 terrorism enhancement and the district court erred by applying the enhancement on the ground that his offense was calculated to retaliate against government conduct without finding that Marshal Forbes's killing of Guy Goughnor was in fact government conduct.

## III.   CONCLUSION

Mr. Ansberry's challenge to the district court's application of the § 2K1.4(a)(1) base offense level is meritless.[14] We agree with Mr. Ansberry,

---

[13] To the extent the government invites us to determine that Marshal Forbes' killing of Guy Goughnor was objectively government conduct, we decline to do so in the first instance.

[14] Mr. Ansberry also argues that the district court's decisions to apply the § 2K1.4(a)(1) base offense level and the § 3A1.2(a) official-victim enhancement are unconstitutional because they are based on judge-found facts at sentencing. Although Mr. Ansberry concedes that our precedent permits this kind of judicial factfinding, *see, e.g.*, *United States v. Redcorn*, 528 F.3d 727, 745–46 (10th Cir. 2008), he seeks to preserve the issue by obtaining a ruling in this court. The government argues, however, that Mr. Ansberry failed to preserve this argument in the district court by raising it only briefly and only with respect to the § 3A1.4 terrorism enhancement. We agree with the government that Mr. Ansberry forfeited the issue with respect to the § 2K1.4(a)(1) base offense level and the § 3A1.2(a) official-victim enhancement by raising it with respect to those two guidelines only long after the court had already ruled on Mr. Ansberry's objections to them. *See Puckett*, 556 U.S. at 135 ("In federal criminal cases, . . . parties . . . preserve claims of error[] 'by informing the court— *when the court ruling or order is made or sought*—of . . . the party's objection to the court's action and the grounds for that objection.'" (emphasis added) (quoting Fed. R. Crim. P. 51(b)). And Mr. Ansberry thereafter waived the issue with respect to

however, that the district court erred by applying the § 3A1.2(a) official-victim enhancement. We also agree with him that the district court erred by applying the § 3A1.4 terrorism enhancement under § 2332b(g)(5)(A)'s retaliation prong without finding that the conduct that Mr. Ansberry's offense was calculated to retaliate against—the killing of Guy Goughnor by Marshal Forbes—was objectively government conduct.[15] We thus **VACATE** Mr. Ansberry's sentence and **REMAND** for resentencing in accordance with this opinion.[16]

---

those two guidelines by failing to argue for plain-error review on appeal. *See United States v. Leffler*, 942 F.3d 1192, 1196 (10th Cir. 2019). As for Mr. Ansberry's argument regarding the constitutionality of the district court's reliance on judge-found facts to increase his sentence under the § 3A1.4 terrorism enhancement, we decline to address this argument here because the district court's assessment of this guideline on remand may render this argument moot.

[15] Our opinion does not necessarily require the district court to make a finding on this disputed question. If, on remand, the district court finds that Mr. Ansberry's offense was calculated to retaliate against some other objectively-defined government conduct or that it was calculated to influence or affect some other government conduct by intimidation or coercion, then determining whether the killing was objectively government conduct might not be necessary to apply the § 3A1.4 terrorism enhancement. We express no opinion on how the district court should resolve this issue.

[16] Mr. Ansberry also challenges the substantive reasonableness of his sentence. Because we conclude that Mr. Ansberry's sentence must be vacated on procedural grounds, his arguments regarding its substantive reasonableness are moot.

41

*United States v. Ansberry*, 19-1048

**EID**, J., concurring in part and dissenting in part.


Today the majority makes two mistakes, in my view.  First, it bypasses traditional waiver principles in order to hold, in the first instance, that the "offense of conviction" under the official-victim enhancement of § 3A1.2(a) is limited to conduct that occurred "[b]etween 4:56 am and 5:14 am on October 11, 2016, [when] Ansberry made several calls on a cellular phone in an attempt to detonate a small destructive device."  Maj. Op. at 23 (quoting guilty plea).  Ansberry did not argue below that his "offense of conviction" was so limited, he does not argue plain error on the point before us, and he therefore has waived the issue.  Second, the majority erroneously holds that a defendant's actions can be "calculated" to "retaliate against government conduct" under the terrorism enhancement of § 3A1.4 only if they are in retaliation for actual, objective government conduct.  *Id*. at 40.  But the language of the enhancement focuses on whether the defendant's actions were "calculated" to retaliate against the government; there is no requirement that the defendant's calculation be in retaliation for *actual*, rather than *perceived*, government conduct.  Accordingly, while I join Part II-A of the majority opinion regarding Ansberry's creation of a "substantial risk of death or serious bodily injury" under § 2K1.4(a)(1)(A), I dissent from Parts II-B and II-C, and thus would affirm the district court with regard to all three sentencing issues.

**I.**

Our doctrine of waiver reflects, and furthers, the principle that an appellate court reviews issues presented to and considered by the district court. As the Supreme Court has long recognized, "[i]t is the general rule, of course, that a federal appellate court does not consider an issue not passed upon below." *Singleton v. Wulff*, 428 U.S. 106, 120 (1976). The Court explained: "this is essential in order that parties may have the opportunity to offer all the evidence they believe relevant to the issues." *Id.* (internal quotation marks and citation omitted). While the "matter of what questions may be taken up and resolved for the first time on appeal is one left primarily to the discretion of the courts of appeals," *id.* at 121, we have cautioned that "our discretion to hear issues for the first time on appeal" is to be "exercise[d] . . . only in the most unusual circumstances," *Lyons v. Jefferson Bank & Trust*, 944 F.2d 716, 721 (10th Cir. 1993). For that reason, "if the theory [a party urges on appeal] simply wasn't raised before the district court, we usually hold it forfeited." *In re Rumsey Land Co.*, 944 F.3d 1259, 1271 (10th Cir. 2019) (internal quotation marks and citation omitted).

The majority reverses the district court by adopting arguments that Ansberry never made before that court. Below, Ansberry did argue, as he does now, that *United States v. Blackwell*, 323 F.3d 1256 (10th Cir. 2003), controls. To that end, he asserted the district court could only consider his offense of conviction. But from there, his analysis departed from his current reasoning. Before the district court, Ansberry insisted that his offense of conviction consisted only of the elements of the offense to which he and the government had agreed—not, as he does now, that the only facts to be considered are those confined

2

within the eighteen minutes during which he attempted to detonate his device, *see* Aplt. Br. at 32.

An examination of the record reveals Ansberry failed to make the argument he now urges our court to contemplate. In August 2017, as part of his "Statement Regarding Applicable Sentencing Guidelines," he wrote: "Mr. Ansberry specifically pled guilty [under 18 U.S.C. § 2332a(a)(2)] to attempting to use a destructive device against property in the United States." ROA Vol. I at 155. For that reason, Ansberry stressed the government could only prove that he targeted a physical property—not "that he attempted to harm any person." *Id.* And that meant, Ansberry continued, that § 3A1.2 was inapplicable because it required individual victims. *Id.* Almost a year later, Ansberry maintained this position in his "Objections to the Pre-Sentence Investigation Report." He explained that "no individuals are victims of the offense," because he "specifically pled guilty [under 18 U.S.C. § 2332a(a)(2)] to attempting to use a destructive device against property in the United States." ROA Vol. I at 205; *see also id.* at 209 (same).

Ansberry did not deviate from this argument during sentencing. It is instructive to look at the district court's language to understand what arguments were presented before it. In accordance with Ansberry's prior reasoning, the district court stated Ansberry pleaded guilty to attempting to use a destructive device against property of the United States. As such, the court observed that Ansberry "argues . . . the Government cannot prove he attempted to harm any person. There are no specified individuals as victims of this offense. And, therefore, there are no individual victims of this offense." ROA Vol. VIII at 398–99. Asked to further articulate his argument, Ansberry reiterated that

3

"[t]here is no specific victim that was listed [in Count 1]," attempted use of a weapon of mass destruction against property under 18 U.S.C. § 2332a(a)(2). *Id.* at 400. He added that because "*Blackwell* stand[s]" for the premise that we look to "the offense of conviction, . . . not the relevant conduct," there can be no victims of his offense as the elements he pleaded guilty to contained "no specified individuals [as] victims of the offense." *Id.* at 401.

Later, in supplemental briefing, Ansberry emphasized to the district court that this enhancement was inapplicable "when the word 'person' was specifically excised from the elements of the crime he pled guilty to, in favor only of the word 'property.'" ROA Vol. I at 342. This is found under a section stating: "[t]he government has not proven that that [sic] Mr. Ansberry was motivated to victimize any government officer or employee," *id.*, giving further support to the notion advanced by Ansberry that *if* he pleaded guilty to using a bomb against *property*, then the district court could not find he targeted individuals. Accordingly, Ansberry argued, application of this enhancement was inapposite given the alleged absence of individual victims in "the elements of the crime he pled guilty to." *Id.*

The record thus demonstrates that Ansberry never broached the subject of confining the "offense of conviction" to an eighteen-minute window of facts. Rather, he repeatedly underscored how his offense of conviction consisted solely of the elements of the offense to which he pleaded guilty—namely, that he attempted "to use a destructive device against property in the United States," ROA Vol. I at 155. Because this offense did not specify that he targeted any persons, there could be no individual victims. For

4

that reason, according to Ansberry, the elements of the offense—targeting of a physical building—precluded application of this official-victim enhancement.

Yet on appeal, Ansberry shifts the nature of his argument. Before us, he argues for the first time that under *Blackwell*, the district court erroneously considered facts outside of the 4:56 a.m. to 5:14 a.m. timeframe during which he attempted to detonate his bomb. *See* Reply Br. at 12 (maintaining that "[t]he only facts immediately related to Mr. Ansberry's conviction for that offense are those he admitted at his plea hearing: . . . that he attempted to 'detonate a destructive device . . . between 4:55 am and 5:15 am on October 11, 2016'" (second omission in original) (quoting ROA Vol. IX at 87–88)); *see also* Aplt. Br. at 32 (same). This proposition is distinct from what he contended below— that the district court could only consider the facts stemming from his "attempt[] to use a destructive device against property in the United States," ROA Vol. I at 155, 205; *see also* ROA Vol. VIII at 399.

And this is a distinction with a difference. Ansberry's addition of the temporal qualifier to the elements of his offense results in a significant narrowing of the universe of facts available for the district court to consider when applying this enhancement. Under his theory before the district court, Ansberry articulated an understanding of *Blackwell* by which the court could properly consider any and all facts concerning his "attempt[] to use a destructive device against property in the United States." ROA Vol. I at 155. In his own words, he contended that "the government can only prove that; it cannot prove that he attempted to harm any person." *Id.* And so given *Blackwell*'s guidance that an offense of conviction consists of the "facts immediately related to the

5

specific offense for which the defendant was convicted," 323 F.3d at 1260, the district court could (and did) examine facts—such as Officer O'Naullain's subsequent discovery of the device—that fell outside of the narrow window during which Ansberry attempted to set off his bomb. Ansberry now invites this court, in the first instance, to significantly limit facts on which the enhancement can be based—an invitation the majority accepts.

Further, the majority accepts Ansberry's invitation with little analysis. It notes that at his change of plea hearing, several months after sentencing, Ansberry did explain "he was pleading guilty to attempting to detonate a destructive device in a deserted shopping center between 4:55 a.m. and 5:15 a.m." on October 11, 2016. Maj. Op. at 8 (internal quotation mark omitted) (quoting ROA Vol. IX at 87–88). But this statement was not made in the context of arguing against an application of § 3A1.2. Instead, Ansberry was explaining "in [his] own words," ROA Vol. IX at 87, to what he was pleading guilty. Notably, he did not take the further step and assert that the district court was *now* restricted from considering the larger picture involving Ansberry's "attempt[] to use a destructive device against property in the United States." ROA Vol. I at 155. Ansberry's description of his plea does not raise the temporal qualifier issue he currently presents on appeal, and the majority makes no assertion that it does.[1] And his failure to

---

[1] The majority concludes instead that the government never asserted that Ansberry waived this argument. And so it holds "the government has waived the waiver and we exercise our discretion to consider the argument on the merits." Maj. Op. at 21 n.6. Whether or not the government argued waiver on this issue before us does not change my analysis, however. Regardless of what the government argues, the majority is still deciding an issue without the benefit of consideration by the district court.

6

make a plain-error argument on appeal renders this issue waived. *See United States v. Leffler*, 942 F.3d 1192, 1196 (10th Cir. 2019).

In the end, this court has made clear "that a party may not lose in the district court on one theory of the case, and then prevail on appeal on a different theory. . . . Our requirement [is] that an issue be presented to, considered [and] decided by the trial court." *Lyons*, 944 F.2d at 721 (internal quotation marks and citations omitted). As in *Lyons*, I would not consider Ansberry's argument that the offense of conviction in this case is limited to facts that occurred "[b]etween 4:56 a.m. and 5:14 a.m. on October 11, 2016, [when] Ansberry made several calls on a cellular phone in an attempt to detonate a small destructive device." Maj. Op. at 23 (quoting guilty plea). The majority's exercise of discretion to do so is, in my view, a mistake.

## II.

Under § 3A1.4, a sentencing court is to apply the terrorism enhancement "[i]f the offense is a felony that involved . . . a federal crime of terrorism," as that term is defined by 18 U.S.C. § 2332b(g)(5). U.S.S.G. § 3A1.4(a). An offense involves a federal crime of terrorism under § 2332b(g)(5) if it "is calculated to influence or affect the conduct of government by intimidation or coercion, or to retaliate against government conduct" and violates a specific enumerated provision. 18 U.S.C. § 2332b(g)(5)(A). As the majority notes, the district court determined Ansberry's offense was intended, in part, "as an act of retaliation for the 1971 killing of Guy Goughnor by Nederland's marshal, Renner Forbes." Maj. Op. at 28–29. But the majority reverses the district court, concluding that "if a sentencing court applies a § 3A1.4 terrorism enhancement on the ground that the

7

defendant's offense was calculated to retaliate against government conduct, the conduct that the defendant retaliates against must objectively be government conduct." *Id.* at 39. In my view, the majority wrongly engrafts an "objective government conduct" limitation onto the language of the § 3A1.4 terrorism enhancement.

The language of the terrorism enhancement focuses on whether the defendant's actions were "calculated . . . to retaliate against government conduct." I see no limitation in this language restricting the enhancement to actions that were taken in retaliation against *objective* government conduct. By this, the majority apparently means that the government conduct must be actual, rather than perceived. *See, e.g.*, *id.* at 37. The majority's interpretation, however, does not take into account the full meaning of the word "calculated."

I agree with the majority that "calculated" ordinarily refers to deliberate planning or specific intentions. And so this phrase represents an act *deliberately planned* to retaliate against government conduct. The dictionary definitions for "calculated" listed by the majority, "devised with forethought" or "planned . . . to achieve [a] stated object," substantiate this ordinary meaning. *Id.* at 34 (listing dictionary definitions of the term). But the majority stops there, concluding that the only work performed in the statutory language by the word "calculated" is that it imposes a specific intent requirement. *See id.* at 35. It then asks, "the specific intent to do what?" *Id.* In answering its own question with "a specific intent to retaliate against government conduct," *id.* at 35–36, it defines government conduct as limited to objective government conduct.

8

But the word "calculated" does more than what the majority gives it credit for. "Calculated" focuses the offense on the planning itself, not on whether or to what extent the planning was successful or realistic. The question is whether the defendant, through planning, *sought* to achieve retaliation against government conduct. This indicates aspirational language that is not dependent on the accomplishment of that purpose. In deciding whether to apply this enhancement, then, a court should look to whether the defendant's offense was devised with forethought or planned to retaliate against what she believed to be government conduct. *See United States v. Awan*, 607 F.3d 306, 317 (2d Cir. 2010) ("Section 2332b(g)(5)(A) does not focus on the defendant but on his 'offense,' asking whether it was calculated, *i.e.*, planned[—]for whatever reason or motive[—]to achieve the stated object."). That the defendant may or may not have ultimately retaliated against actual or objective "government conduct" does not change the fact that she set out to achieve this goal.

In the end, the statute's use of the word "calculated" tells us something important about the "government conduct" at issue, namely, that *the goal* of the defendant's conduct must be retaliation for government conduct. This goal remains the same whether the government conduct is real or perceived.

It is not the meaning of "government conduct" we are seeking here, but the meaning of "calculated . . . to retaliate against government conduct." Justice Scalia and Bryan Garner explained the reasoning behind looking to the ordinary meaning of a phrase as a whole, rather than fixating on the meaning of individual words in the phrase: "Adhering to the *fair meaning* of the text (the textualist's touchstone) does not limit one

9

to the hyperliteral meaning of each word in the text.  In the words of Learned Hand: 'a

sterile literalism . . . loses sight of the forest for the trees.'  The full body of a text

contains implications that can alter the literal meaning of individual words."  Antonin

Scalia & Bryan A. Garner, Reading Law: The Interpretation of Legal Texts 356 (2012)

(footnote omitted).  Here, the majority, in my view, misses the full meaning of the

language by artificially cordoning off the term "calculated" from the rest of the statutory

phrase.[2]

Caselaw from our sister circuits reinforces this understanding as to the impact of

"calculated" on the statutory phrase.  In *United States v. Wright*, for example, the Sixth

Circuit upheld application of this enhancement, observing: "[a] defendant has the

requisite intent if he or she acted with the *purpose* of influencing or affecting government

conduct and planned his or her actions with this objective in mind."  747 F.3d 399, 408

(6th Cir. 2014) (emphasis added).  To this end, the Sixth Circuit highlighted the

defendants' belief that if they bombed a bridge, this "would likely affect the conduct of

government agencies by prompting them to take heightened security measures."  *Id.* at

410.  Regardless of whether or not this intended offense would *actually* "influence or

affect the conduct of government," 18 U.S.C. § 2332b(g)(5)(A), it was the defendants'

---

[2] This error, in my view, causes the remainder of the majority's statutory analysis to fall.  For example, while it is true that the term "government" refers to the governing authority of a state, Maj. Op. at 37 n.11, the term "calculated" suggests that retaliating against government conduct must be the goal of the defendant's conduct.  And while it is true that the enhancement does not contain "express language" regarding a defendant's perception, as is found in other statutes, Maj. Op. at 37, such language would be superfluous here given the use of the term "calculated."

desired end state which carried weight. *See Wright*, 747 F.3d at 410 ("The evidence demonstrates that Wright, Baxter, and Stevens undertook the bridge-bombing plot within a context of plans that they *understood* to implicate government interests. They intended to engage in violent protests in Chicago, which—*to their minds, at least*—would likely involve combat with law enforcement officers. . . . They *expected* that the government would respond to the bridge bombing." (emphases added)).

And in *United States v. Van Haften*, 881 F.3d 543 (7th Cir. 2018), the Seventh Circuit similarly affirmed. Before the defendant was actually able to join ISIS, he was caught traveling to Turkey. Despite "the factual predicates that motivated his decision [being] false or absurd," *id.* at 545, such as "that Britain's Prince William is the Antichrist, that people can use numerology to predict the future, and that most Western political leaders are closet Satanists," *id.* at 543, "[a]ll that matters is that he did, in fact, commit a crime calculated to retaliate against the government," *id.* at 545 (citations omitted). Finally, in *United States v. Mandhai*, the Eleventh Circuit upheld application of the terrorism enhancement after concluding that evidence supported the district court's finding that the object of the offense "was to influence or affect government conduct, or to retaliate against past government action." 375 F.3d 1243, 1248 (11th Cir. 2004). The defendant pleaded guilty to conspiring to destroy buildings affecting interstate commerce. He argued there was insufficient evidence to prove his crime "was calculated to influence or affect the conduct of government by intimidation or coercion, or to retaliate against government conduct since it was speculative that he would or could follow through on the conspiracy's plan to bomb electrical substations," *id.* (internal quotation marks

11

omitted), which called into question his ability to *actually* affect or retaliate against government conduct. "Contrary to [the defendant's] assertion, the terrorism enhancement does not hinge upon a defendant's ability to carry out specific terrorist crimes or the degree of separation from their actual implementation." *Id.* Further, the court had no need to delve into whether or not bombing electrical substations would indeed affect government conduct. That was immaterial—instead, "it is the defendant's *purpose* that is relevant, and if that *purpose* is to promote a terrorism crime, the enhancement is triggered." *Id.* (emphases added).

The majority responds to this statutory construction by turning to the rule of lenity. *See* Maj. Op. at 37 n.12 ("To the extent the dissent has identified a contrary reasonable interpretation of the criminal statute, the rule of lenity dictates that we interpret it in favor of Mr. Ansberry."). But the rule of lenity is not applicable to the present case. Where, as here, the plain text of the statute yields a straightforward interpretation, the rule of lenity has no role to play. What is more, "[t]he simple existence of some statutory ambiguity, however, is not sufficient to warrant application of [the rule of lenity], for most statutes are ambiguous to some degree." *Muscarello v. United States*, 524 U.S. 125, 138 (1998) (citation omitted). For that reason, to invoke this rule, we must conclude there is a "grievous ambiguity or uncertainty in the language . . . of the [statute]." *Chapman v. United States*, 500 U.S. 453, 463 (1991) (internal quotation marks omitted) (quoting *Huddleston v. United States*, 415 U.S. 814, 831 (1974)). There is no such grievous ambiguity here.

12

As the majority observes, the district court "found by clear and convincing evidence" that Ansberry's offense was indeed calculated to retaliate against what he perceived to be government conduct. Maj. Op. at 28; *see also* ROA Vol. IX at 22–23, 26–27. Accordingly, I would affirm the district court's application of the § 3A1.4 enhancement on this ground.

***

For the reasons stated above, I would affirm the district court's imposition of the § 3A1.2(a) official-victim enhancement and the § 3A1.4 terrorism enhancement. Accordingly, I respectfully dissent from Parts II-B and II-C of the majority opinion.